PHILLIPS VS. NETBLUE RITCHIE PHILLIPS          AUGUST 28, 2006

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

RITCHIE PHILLIPS, dba R&D COMPUTERS,

     Plaintiff,

vs.                                CASE NO: C05-4401 SC

NETBLUE, INC., formerly known as
YFDIRECT, INC., also doing business
as MARKETSURVEYGROUP.COM, also dba
EASYEZSTREET.COM, also dba
MINGLYCOMP.INFO, also dba
EVERYFREEGIFT.COM, KENNETH CHAN,
aka KENNETH CHEN, SCOTT REWICK,
DEREK PILCH, FREDRICK HARMAN, and
DOES ONE through FIFTY, inclusive,

     Defendants.
                            /

DEPOSITION OF RITCHIE PHILLIPS

Monday, August 28, 2006

Pages 1 - 126

(HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXHIBITS BOUND SEPARATELY)

REPORTED BY JOANNE ICHIKI, CSR #11660

b5cc5e24-d3ac-4436-aaa4-f02314997231

PHILLIPS   VS.   NETBLUE   RITCHIE PHILLIPS                    AUGUST 28, 2006

---

Page 2

```
 1              A P P E A R A N C E S
 2   FOR THE PLAINTIFF:
 3        SINGLETON LAW GROUP
 4        BY: JASON K. SINGLETON, ATTORNEY AT LAW
 5        BY: RICHARD E. GRABOWSKI, ATTORNEY AT LAW
 6        611 L Street, Suite A
 7        Eureka, California 95501
 8        (707) 441-1177
 9
10   FOR THE DEFENDANTS:
11        CARR & FERRELL, LLP
12        BY: STUART C. CLARK, ATTORNEY AT LAW
13        BY: CHRISTINE WATSON, ATTORNEY AT LAW
14        2200 Geng Road
15        Palo Alto, California 94303
16        (650) 812-3400
17
18   ALSO PRESENT:
19        DAN MOTTAZ VIDEO PRODUCTIONS, LLC
20        BY: TRUDI AEMETT, VIDEOGRAPHER
21        182 Second Street, Suite 202
22        San Francisco, California 94105
23        (415) 624-1300
24
25        DEREK PILCH
```
Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

---

Page 3

```
 1                  I N D E X
 2   EXAMINATION BY:                    PAGE
 3   Mr. Clark                  7
 4
 5              E X H I B I T S
 6   EXHIBIT NO.     DESCRIPTION     PAGE
 7   1    Copy, printout from R&D        13
 8        Computers Web site, 11/22/05,
 9        5 pages
10
11   2    Copy, Plaintiff's Requests for    26
12        Admission, Set One, 3/21/06,
13        10 pages
14
15   3    Copy, Complaint for Damages and   29
16        Injunctive Relief - Violation
17        of Can-Spam Act of 2003 and
18        California Business & Professions
19        Code Section 17529.5, 10/27/05,
20        8 pages
21
22   4    Copy, printout of e-mail        31
23        information, 10/31/05, 24 pages
24
25
```
Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

---

Page 4

```
 1              E X H I B I T S
 2   EXHIBIT NO.     DESCRIPTION     PAGE
 3   5    Copy, printout of e-mail        34
 4        information, undated, 88 pages
 5        (BOUND SEPARATELY)
 6
 7   6    Copy, e-mail address, undated,    37
 8        3 pages
 9        (BOUND SEPARATELY)
10
11   7    Copy, e-mails between various     48
12        parties, various dates, 26
13        pages
14        (BOUND SEPARATELY)
15
16   8    Copy, Plaintiff's Responses     107
17        to Defendants' Interrogatories,
18        5/23/06, 7 pages
19
20   9    Copy, Plaintiff's Responses     111
21        to Defendants' Interrogatories,
22        4/17/06, 14 pages
23
24
25
```
Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

---

Page 5

```
 1              E X H I B I T S
 2   EXHIBIT NO.     DESCRIPTION     PAGE
 3   10   Copy, Complaint for Damages and  114
 4        Injunctive Relief - Violation
 5        of Can-Spam Act of 2003 and
 6        California Business and
 7        Professions Code Section 17529.5,
 8        1/4/06, 8 pages
 9
10   11   Copy, First Amended Complaint    114
11        for Damages and Injunctive
12        Relief - Violation of Can-Spam
13        Act of 2003 and California
14        Business and Professions Code
15        Section 17529.5, 12/20/05,
16        8 pages
17
18
19
20
21
22
23
24
25
```
Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

---

2 (Pages 2 to 5)

b5cc5e24-d3ac-4436-aaa4-f02314997231

PHILLIPS   VS.   NETBLUE   RITCHIE PHILLIPS           AUGUST 28, 2006

Page 6

1       BE IT REMEMBERED that, pursuant to Notice of
2  Taking Deposition, and on Monday, August 28, 2006,
3  commencing at the hour of 10:37 a.m. thereof at Carr
4  & Ferrell, 2000 Geng Road, Palo Alto, California,
5  before me, JOANNE ICHIKI, a Certified Shorthand
6  Reporter, the following proceedings were had.
7       THE VIDEOGRAPHER:  Good morning.  This
8  marks the beginning of Volume I, Videotape 1 in the
9  deposition of Ritchie Phillips in the matter of        10:37:10
10 Ritchie Phillips dba R&D Computers versus NetBlue,
11 Incorporated et al. in the United States District
12 Court, Northern District of California, San Francisco  10:37:20
13 Division, Case No. C05-4401 SC (EDL).
14       Today's date is August 28, 2006, and the
15 time is 10:37 a.m.  The location of this deposition   10:37:39
16 is the law offices of Carr & Ferrell, LLP, 2200 Geng
17 Road in Palo Alto, California.  The deposition was
18 noticed by attorneys for defendants, and the          10:37:52
19 videotape is being produced on behalf of the same.
20       The video operator is Trudi Aemett, a
21 California Notary Public for the County of Alameda,    10:38:02
22 employed by Dan Mottaz Video Productions, LLC, 182
23 Second Street, Suite 202, San Francisco, California
24 94105.  (415) 624-1300.  The court reporter today is   10:38:19
25 JoAnne Ichiki of Grossman &

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 7

1  Cotter/Comp-U-Scripts/Weber & Volzing.
2       Would counsel present please identify
3  themselves and state whom they represent.            10:38:29
4       MR. SINGLETON:  Jason Singleton appearing
5  for plaintiff, Ritchie Phillips.
6       MR. GRABOWSKI:  Richard Grabowski appearing  10:38:36
7  for plaintiff, Ritchie Phillips.
8       MR. SINGLETON:  Stuart Clark representing
9  the defendants.                                      10:38:40
10      THE VIDEOGRAPHER:  If there are no
11 stipulations, the reporter may administer the oath.
12            RITCHIE PHILLIPS,                         10:38:55
13 called as a witness by the Defendants, and who, being
14 first administered an oath, was thereupon examined
15 and testified as hereinafter set forth.              10:38:55
16       EXAMINATION BY MR. CLARK
17 BY MR. CLARK:
18   Q.  Good morning, Mr. Phillips.                    10:38:58
19   A.  Good morning.
20   Q.  Would you please state your full name for
21 the record.                                          10:39:01
22   A.  Ritchie A. Phillips.
23   Q.  What is your business address,
24 Mr. Phillips?                                         10:39:05
25   A.  Number 8 Fifth Street, Eureka, California.

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 8

1    Q.  And do you trade under a dba?
2    A.  Yes.  R&D Computers.
3    Q.  Okay.  Have you had your deposition taken   10:39:17
4  before?
5    A.  No.
6    Q.  Let me tell you a little bit -- let me ask  10:39:21
7  you this first.
8        Have you ever testified in a court of law
9  before?                                              10:39:25
10   A.  No.
11   Q.  There are a few basic rules that I'm sure
12 your attorney has run through with you, but let me   10:39:35
13 just remind you of some of those.
14       The first is that you are under oath and
15 you are, therefore, required to testify as accurately 10:39:42
16 and honestly as you would in a court of law.
17       Do you understand that?
18   A.  Um-hum.  Yes, I do.                            10:39:46
19   Q.  Secondly, you will notice that everything
20 is being transcribed, not only on videotape, but also
21 by the stenographer, and that means that we have to  10:39:58
22 be careful to protect the record and not speak over
23 each other.  As a result, I'd ask you to be careful
24 that you don't answer the questions before I get to  10:40:08
25 the end of my questions.  Often you will know exactly

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 9

1  what I'm asking for, and sometimes the questions are
2  unbearably long.  But if you'll be patient --
3    A.  Sure.                                          10:40:18
4    Q.  -- I'll do the same and try not to speak
5  over your answers.
6        Is that fair enough?                           10:40:22
7    A.  Yes.
8    Q.  One of the other rules is that you need to
9  answer with a word.  Gestures such as nods of the    10:40:29
10 heads, of course, can't be picked up by the
11 stenographer.  So please, if you would, answer with
12 words.                                               10:40:35
13   A.  Okay.
14   Q.  Are you under any medication that would
15 prevent you from testifying accurately and honestly  10:40:42
16 today?
17   A.  No.
18   Q.  Is there any other physical medical reason  10:40:48
19 why you should not be able to testify accurately and
20 honestly today?
21   A.  Not that I know of.                            10:40:55
22   Q.  What are your educational qualifications
23 after high school?
24   A.  I have a -- I did two years at business      10:41:06
25 college in Bellevue, Washington.

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

GROSSMAN & COTTER        (650) 324-1181                 06AUG2806

b5cc5e24-d3ac-4436-aaa4-f02314997231

PHILLIPS   VS.   NETBLUE   RITCHIE PHILLIPS                AUGUST 28, 2006

Page 10

1   Q.  What college was that?
2   A.  Griffin.
3   Q.  Did you graduate from Griffin?        10:41:17
4   A.  I never graduated.  I never finished there,
5   their particular curriculum.
6   Q.  What years were you at Griffin?       10:41:26
7   A.  Pardon me?
8   Q.  What years were you at Griffin?
9   A.  Oh, jeez.  Well, I -- I'm going to have to  10:41:39
10  guess because I don't remember exactly.  But it would
11  have been about 26 years ago.
12  Q.  Okay.  That's close enough.  Do you have   10:41:54
13  any California state licenses, like a Realtor or an
14  insurance broker or anything like that?
15  A.  No.                      10:42:03
16  Q.  Do you have any qualifications -- I beg
17  your pardon.  Withdraw that.
18      Do you have any professional        10:42:08
19  qualifications, such as a CPA, lawyer, or anything
20  like that?
21  A.  No.                      10:42:11
22  Q.  Are you the sole proprietor of R&D
23  Computers?
24  A.  Yes.                     10:42:19
25  Q.  How long have you conducted business as R&D

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 11

1   Computers?
2   A.  Once again, I'll have to guess.  But it's
3   about ten years we've been in the --        10:42:35
4   Q.  What did you do immediately prior to your
5   starting to conduct business as R&D Computers?
6   A.  I worked as a consultant.  I worked in a   10:42:56
7   couple computer stores up in Bellevue as a tech
8   support and as sales.
9   Q.  That's Bellevue in the state of Washington?  10:43:11
10  A.  Bellevue, Washington, yes.
11  Q.  Who was your last employer immediately
12  before you started R&D Computers?         10:43:19
13  A.  I was self-employed then as a consultant.
14  My last actual, where I was an employee, was Micro
15  Options.  It was a computer store in Bellevue.    10:43:39
16  Q.  Has R&D Computers -- withdraw that.
17      What is the physical address of R&D
18  Computers?                    10:43:51
19  A.  Number 8 Fifth Street, Eureka, California.
20  Q.  How long has the business been at those
21  premises?                    10:43:58
22  A.  About ten years.
23  Q.  Prior to your starting R&D Computers, was
24  your last job as a consultant in Eureka, or was it in  10:44:15
25  some other place?

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 12

1   A.  Well, actually, I did -- I worked for a
2   company in Eureka, which the business sort of sprang
3   out of.  It was New Life Services.  I worked -- I    10:44:32
4   don't know what you would call my job.  Probably IT
5   for them.
6   Q.  Did you at sometime live in Washington?    10:44:44
7   A.  Yes.  I lived in Washington for 20 years.
8   Q.  Okay.  When did you move to Eureka from
9   Washington?                   10:44:54
10  A.  I think it was about 15 years ago.
11  Q.  Have you published any books or articles?
12  A.  No.                      10:45:14
13  Q.  Do you maintain a blog?
14  A.  No.
15  Q.  Have you ever spoken at any function,     10:45:27
16  either public or to any particular group?  Let me
17  narrow that down.  I want to ask you about
18  Internet-related matters and computer-related     10:45:39
19  matters.  So let me narrow the question.
20  A.  Only to clients.  So not public, no.
21  Q.  Have you ever taught any subject at all?   10:45:51
22  A.  I've taught computer -- beginning computer
23  classes.
24  Q.  What teaching have you done in computer    10:45:58
25  classes?

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 13

1   A.  Well, it was -- it's a long time since I've
2   done any teaching classes.  But I've taught software
3   and basic:  This is a keyboard.  This is a mouse for  10:46:18
4   beginner classes.
5   Q.  And are those beginner classes typically in
6   situations in which you have a number of students?   10:46:28
7   A.  Yes.  But I haven't taught those in years.
8   So those aren't recent.
9       MR. CLARK:  Let me have marked as Exhibit 1  10:46:58
10  a document which consists of a printout of a download
11  from the Internet, which is entitled "R&D Computers."
12      (Whereupon, Defendants' Exhibit 1 was     10:47:24
13  marked for identification.)
14  BY MR. CLARK:
15  Q.  Mr. Phillips, would you please look at     10:47:28
16  Exhibit 1 and tell me if you recognize that as
17  certain pages that have been printed out from the R&D
18  Computers' Web site.                10:47:37
19  A.  Yes.  It's our Web page.
20  Q.  Now, there are a number of bullet points on
21  the first page under the word "Featuring."       10:47:46
22      Do you see that?
23  A.  Yes.
24  Q.  Do those bullet points describe the nature  10:47:52
25  of the services that R&D Computers provides?

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

GROSSMAN & COTTER        (650) 324-1181                06AUG2806

b5cc5e24-d3ac-4436-aaa4-f02314997231

PHILLIPS   VS.   NETBLUE   RITCHIE PHILLIPS                AUGUST 28, 2006

---

Page 14

1    A.  Only vaguely.
2    Q.  Okay.  What -- let's take them one by one.
3        What is the first bullet point which reads,  10:48:02
4    "Sales and service of personal computers."  What
5    business activity does that involve?
6    A.  That's retail sales of computer systems.    10:48:09
7    Q.  Then the second bullet point reads, quote,
8    "DOS, Windows 3X, NT, 9X and 2000, Novell and UNIX
9    support," end of quotes.                    10:48:29
10       Do you see that?
11   A.  I do.
12   Q.  What kind of service does R&D Computers    10:48:33
13   provide with respect to those activities?
14   A.  Well, it's only a statement of familiarity
15   with all of those operating systems.  In other words,  10:48:42
16   I'm very familiar with all of those operating systems
17   personally.
18   Q.  Okay.                          10:48:48
19   A.  And our company is.
20   Q.  Going down to the third bullet point, which
21   refers to, quote, "On site service and system    10:48:57
22   administration," end of quotes.
23       Do you see that?
24   A.  Yes.                           10:48:59
25   Q.  What does that activity involve?

---

Page 15

1    A.  We have customers or clients that we go
2    over to their site and look on their networks, system
3    administration as in the networks.  We maintain their  10:49:13
4    networks for them.
5    Q.  Going down to the next category, quote,
6    "Telephone support and remote administration," end of  10:49:25
7    quotes.
8        What does that involve?
9    A.  It's telephone support if they call me.  I  10:49:33
10   help them on -- I help -- I spend a lot of time on
11   the telephone helping people work through whatever
12   their problems.                      10:49:40
13       And remote administration is me logging on
14   to their machines remotely from my site and doing
15   whatever needs to be done.                10:49:51
16   Q.  Okay.  So if somebody has a problem --
17   their computer won't boot or something -- they can
18   call you and you can help them through the problem?  10:50:00
19   A.  Yes.
20   Q.  Going down to the next category, quote,
21   "ISP to the Eureka area using 56K V.90 modems," end  10:50:10
22   of quotes.
23       What does that activity involve?
24   A.  We are an ISP.  We do Internet service    10:50:15
25   providing.  And we have a dial-up service.  We have

---

Page 16

1    -- yeah, we have a dial-up service.
2    Q.  What are the nature of the ISP services
3    that you offer?  Is it only the dial-up service?    10:50:40
4    A.  Well, as pertaining to this page, yes.
5    Q.  Okay.  When you say "dial-up service," what
6    do you mean by that?                    10:50:47
7    A.  Well, you have a phone modem where you hook
8    your computer to the telephone and want to dial into
9    the Internet.  Then we offer phone numbers and access  10:50:57
10   to the Internet through that dial-up service.
11   Q.  Okay.  Who is the provider through whom you
12   offer that dial-up service?                10:51:10
13   A.  We have a commercial grade T-1.
14   Q.  Okay.  And did you have a provider, such as
15   a phone company or --                   10:51:19
16   A.  Well, we buy our T-1 from -- and our onramp
17   from Pac Bell, which I guess is AT&T now.
18   Q.  Does that service include offering e-mail   10:51:42
19   accounts?
20   A.  Yes.
21   Q.  In what way is an e-mail account offered?  10:51:51
22   What I mean by that is, if one of your clients wanted
23   an e-mail account, how would you set that up for
24   them?                           10:51:59
25   A.  We have e-mail servers, and we just put in

---

Page 17

1    their name and password.
2    Q.  How long has R&D Computers offered the
3    service of an ISP to the Eureka area?        10:52:22
4    A.  I -- once again, I'm guessing.  But it was
5    shortly after we moved in the building.  So it's
6    running along ten years now.              10:52:31
7    Q.  Going back to the bullet points, I guess
8    the last one of all reads, quote, "Web site hosting.
9    Co location and merchant services," end of quotes.    10:52:50
10       What do those activities involve?
11   A.  The Web site housing is we'll post Web
12   sites on the Internet from our servers.  We don't do  10:53:01
13   any Co location or merchant services.  We never
14   pursued that side of it.
15   Q.  Now, with the Web site hosting, do you    10:53:11
16   charge a monthly or quarterly or other periodical fee
17   for that service?
18   A.  We do.                        10:53:20
19   Q.  Of -- let me withdraw that.
20       Are there any other services that R&D
21   Computers provides that we have not yet discussed?  10:53:31
22   A.  We have a -- we have commercial grade
23   Internet access accounts that are wireless to our
24   building, and therefore, much faster than dial-ups.  10:53:57
25   Q.  When you say "wireless to your building,"

---

GROSSMAN & COTTER        (650) 324-1181              06AUG2806

b5cc5e24-d3ac-4436-aaa4-f02314997231

PHILLIPS   VS.   NETBLUE   RITCHIE   PHILLIPS                    AUGUST 28, 2006

---

Page 18

1  do you mean the area network is limited to your
2  building?
3      A.  No.  We have antennas on our roof and it's  10:54:08
4  -- we have wireless connections to the buildings
5  around the Eureka area.
6      Q.  Are you able to estimate the percentage of  10:54:26
7  R&D Computers' revenues that are attributable to
8  acting as an ISP to the Eureka area?
9      A.  I'd have to look closer at financial  10:54:44
10 statements to be able to tell you that.  I can't tell
11 you that off the top of my head.
12     Q.  Could you tell me whether it's less than or  10:54:50
13 more than 25 percent of R&D's total revenues?
14     A.  If I was going make a guess, I would have
15 said about 25 percent.  But I don't know if that's  10:54:59
16 accurate.
17     Q.  Okay.  What would you have to look at to
18 determine with accuracy what percentage the ISP  10:55:08
19 related activities were?
20     A.  I'd have to go back and look at financial
21 statements over the last few years.  10:55:14
22     Q.  Would those financial statements reflect a
23 breakdown for each of the different activities that
24 R&D Computers conducts?  10:55:23
25     A.  Pretty much.

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

---

Page 19

1      Q.  For example, would there be a line item of
2  revenue from ISP-related services?
3      A.  Yes.  10:55:31
4      Q.  Would you turn to the second page of
5  Exhibit 1, please.
6          Who is Dianne Phillips?  10:55:44
7      A.  My wife.
8      Q.  And who is Brian Small?
9      A.  He no longer works with us.  He was a  10:55:52
10 technician.
11     Q.  Do you know when Mr. Small works now?
12     A.  I don't know the name of the company.  10:56:01
13     Q.  Do you know what his residential address
14 is?
15     A.  I don't know his residential address.  We  10:56:09
16 have it on file, but I don't know it.
17     Q.  If you -- do you know the business address
18 of the company that he works for now?  10:56:16
19     A.  No, I don't.  This is very recent,
20 actually, in the last couple weeks.
21     Q.  Does Mr. Small still live in the Eureka  10:56:26
22 area?
23     A.  Yes.
24     Q.  And does the company work for -- withdraw  10:56:29
25 that.

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

---

Page 20

1          Does the company he works for conduct
2  business in the Eureka area?
3      A.  I assume so.  I can't speak for their  10:56:38
4  business.
5      Q.  Do they have premises in the Eureka area?
6      A.  Yes.  10:56:42
7      Q.  Does your wife, Dianne Phillips, work with
8  you in the business?
9      A.  Yes.  10:56:51
10     Q.  What is her role?
11     A.  Mostly bookkeeping.
12     Q.  What was Mr. Small's role when he worked  10:57:02
13 for the company?
14     A.  He was a technician.
15     Q.  Do you currently have any other people  10:57:08
16 working in the business apart from you and Dianne
17 Phillips?
18     A.  No.  10:57:12
19     Q.  Other than Mr. Small, did you have at any
20 time anybody else working with you in the business
21 apart from yourself and Dianne Phillips?  10:57:27
22     A.  Yes.
23     Q.  Who else worked for you?
24     A.  We haven't for a number of years.  And to  10:57:36
25 be honest with you, I don't remember their names.  We

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

---

Page 21

1  have records of all that stuff, but I don't remember.
2      Q.  Would you turn to the next page of Exhibit
3  1, please, which is headed "R&D's Web services."  10:57:57
4  Do you have that?
5      A.  Yes.
6      Q.  Now, I may not remember clearly what your  10:58:04
7  testimony was.  Did you say that you don't offer Co
8  location services?
9      A.  No.  It's not that we don't offer it; we've  10:58:13
10 never pursued that and have never actually -- I mean,
11 if somebody called me up and wanted to mount a server
12 there, I'd consider it.  But we've never done it.  10:58:23
13     Q.  Would you turn to the next page, which is
14 the fourth page of Exhibit 1.  It's headed "R&D's
15 Price List."  10:58:34
16         Do you see that?
17     A.  R&D's book?
18     Q.  R&D's Price List.  10:58:39
19     A.  Oh, yes.
20     Q.  It's probably self explanatory, but what
21 does the price list reflect?  10:58:49
22     A.  Well, it's out of date, for one thing.
23     Q.  I see that.
24     A.  But you know, it reflects -- I don't quite  10:58:59
25 understand the question.

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

---

6 (Pages 18 to 21)

GROSSMAN & COTTER          (650) 324-1181                    06AUG2806

b5cc5e24-d3ac-4436-aaa4-f02314997231

PHILLIPS   VS.   NETBLUE   RITCHIE PHILLIPS          AUGUST 28, 2006

Page 22

1    Q.  Okay.  Does this show prices at which R&D
2  was selling the hardware described on this document
3  as of the date of this document, which is --      10:59:11
4    A.  Yes, I think so.
5    Q.  Let me ask you about the e-mail accounts.
6        When a client or customer comes to you and   10:59:48
7  wants an e-mail account, does that person enter into
8  a contract with R&D Computers?
9    A.  I don't think so, although I'm not sure how  11:00:06
10 you'd define a contract.
11   Q.  Let's walk through the process.  I realize
12 that that's a definitional issue.  So let me walk     11:00:13
13 through the process.
14       If I wanted to have an e-mail account and I
15 came to see you and said, "I need an e-mail account;  11:00:20
16 can you help me," what would be the first step in
17 setting up an e-mail account for me?
18   A.  I would need some money.  And I would need   11:00:30
19 a log-in name and a password.
20   Q.  And currently, if I were to come to you
21 today and ask for you to set up an e-mail account,    11:00:43
22 how much money would be payable up front?
23   A.  Well, I'm assuming that you don't have an
24 Internet account with us or any other account and all 11:00:51
25 you want is an e-mail account.  Then I think we'd

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 23

1  charge five bucks a month for those.
2    Q.  Now, if I wanted a -- what did you call it?
3  An Internet account?                   11:01:12
4    A.  (Witness nods.)
5    Q.  If I wanted an Internet account in addition
6  to an e-mail account, what would that involve?     11:01:17
7    A.  The Internet account comes with an e-mail
8  account.
9    Q.  So if I sign up for an e-mail account, I   11:01:24
10 can get access to the Web generally, can I?
11       MR. SINGLETON:  It's a misstatement of his
12 prior testimony.  He said if you order an Internet   11:01:30
13 account, you get an e-mail, not by vice versa.
14       MR. CLARK:  Okay.  Let me clarify that.
15 BY MR. CLARK:                        11:01:36
16   Q.  So if you sign up for an Internet account,
17 you get e-mail with it, do you?
18   A.  Yes.                      11:01:40
19   Q.  If you sign up for e-mail alone --
20   A.  You have to have your own Internet account.
21 I assume you have it somewhere else.          11:01:47
22   Q.  So somebody like AOL or something like
23 that?
24   A.  Could be.  Anybody that gets you the      11:01:53
25 Internet.

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 24

1    Q.  Now, would somebody signing up for an
2  e-mail account be required to sign some kind of
3  documentation, an application form or anything like   11:02:11
4  that?
5    A.  No.
6    Q.  So an applicant for an e-mail account would 11:02:18
7  pay the initial amount, whatever it is, $5.
8        Would that be the first step?
9    A.  Yes.                     11:02:25
10   Q.  And then would you then bill holders of
11 those e-mail accounts on a monthly basis?
12   A.  Would I bill them on a monthly basis?  Is   11:02:34
13 that what you're asking?
14   Q.  Yes.
15   A.  Yes.                     11:02:36
16   Q.  So at any time you will have a complete
17 list in your accounting department of everybody who
18 has an e-mail account through R&D Computers?       11:02:46
19   A.  No.
20   Q.  Why not?
21   A.  Well, there are some people who have       11:02:54
22 Internet accounts who want multiple e-mail accounts,
23 for their children, their wife.  So some accounts
24 will have multiple e-mail addresses.          11:03:03
25       And so your question was:  In our

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 25

1  accounting, did we have a record of that?  And no, we
2  don't.
3    Q.  Okay.  So if somebody got their e-mail     11:03:11
4  accounts through an Internet account, you would have
5  a list of all the people who held Internet accounts,
6  would you?                       11:03:18
7    A.  Yes.
8    Q.  And if -- well, do you ever have people who
9  come in and just ask for an e-mail account without an 11:03:27
10 Internet account?
11   A.  We have a couple.  They are there few.
12   Q.  Okay.  And presumably you could determine   11:03:33
13 who those are if you went and looked in your records?
14   A.  Yeah.  With a little bit of effort I could.
15   Q.  Do you know how many Internet account      11:03:55
16 holders you have right now?
17   A.  Maybe -- these dial-up accounts, probably a
18 150 of them, maybe.                   11:04:05
19   Q.  And currently, how many do you have that
20 are only e-mail accounts, not Internet accounts?
21   A.  I would think it would be very few.  I     11:04:17
22 would say ten or fifteen of them.
23   Q.  Do you offer any type of spam filtering to
24 your customers?                     11:04:32
25   A.  I do.

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

GROSSMAN & COTTER      (650) 324-1181          06AUG2806

b5cc5e24-d3ac-4436-aaa4-f02314997231

PHILLIPS VS. NETBLUE RITCHIE PHILLIPS                  AUGUST 28, 2006

Page 26

1    Q.  In what form?
2    A.  We filter all e-mail coming in.
3       MR. CLARK:  Let me have marked as Exhibit 2  11:05:04
4  a copy of the Complaint in this action.
5       (Whereupon, Defendants' Exhibit 2 was
6  marked for identification.)              11:05:08
7  BY MR. CLARK:
8    Q.  Mr. Phillips, would you please look at
9  Exhibit 2 and tell me if you recognize that as a copy  11:05:31
10  of your Complaint in this case.
11   A.  I do.
12   Q.  What I'd like you to do, please, is to turn  11:05:40
13  to Paragraph 9 initially.  That paragraph, it's on
14  Page 4.  It reads, quote, "Plaintiff alleges that
15  defendants sent or caused to have sent in excess of  11:05:55
16  1,500 deceptive and unsolicited commercial electronic
17  mail messages from August 27, 2005 through September
18  30, 2005 to plaintiff's server, a protected  11:06:09
19  computer," end of quotes.
20      Do you see that?
21   A.  Yes.                         11:06:12
22   Q.  What physical device are you referring to
23  when you talk about "plaintiff's server, a protected
24  computer"?                        11:06:24
25   A.  What device?

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 27

1    Q.  Yes.  Do you have a server physically on
2  your premises?
3    A.  Yes.                         11:06:29
4    Q.  And do you have a single server or do you
5  have multiple servers?
6    A.  I have multiple servers.           11:06:36
7    Q.  How many do you have currently?
8    A.  Well, I only have one that actually --
9  well, I have two that actually process e-mail.  11:06:55
10   Q.  What are the makes of those computers?  Are
11  they -- what products are they?
12   A.  Pardon me?                    11:07:05
13   Q.  What are the makes of those computers?  Are
14  they Dell?  Are they IBM?  Who is the manufacturer?
15   A.  No.  We build them in the shop.      11:07:15
16   Q.  How long have you had each -- withdraw
17  that.
18      How long have you used each of those  11:07:27
19  servers?
20   A.  I guess I'm thinking you're asking me how
21  long have I had servers doing this function?  11:07:42
22   Q.  Yes.
23   A.  Those servers get updated and the equipment
24  gets changed periodically.            11:07:47
25   Q.  I'm assuming that you throw out servers and

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 28

1  you bring in new servers.  I'm trying to identify the
2  ones that you have currently in use.
3      How long have those two been in use?  11:07:59
4    A.  I guess -- I think you're asking me about
5  the physical machine then.
6    Q.  Yes.  Yes, I am.               11:08:04
7    A.  The ones that are in there now?
8    Q.  Right.
9    A.  Well, I just redid the filter on one about  11:08:11
10  three weeks ago.  And the mail server, I redid a
11  couple years ago.
12   Q.  Now, the first -- the first that you  11:08:24
13  referred to, the one that you talked about filtering,
14  is that not a mail server?  Or is that also a mail
15  server?                         11:08:31
16   A.  Well, it's not a mail server.  It's the
17  spam filter.  It filters all the mail coming in.
18   Q.  So currently, you have one server that  11:08:44
19  operates as a spam filter; is that correct?
20   A.  Yes.
21   Q.  And then you have one server that operates  11:08:48
22  as a mail server; is that correct?
23   A.  Yes.
24   Q.  And the server that operates as a mail  11:08:57
25  server, has that been in place -- withdraw that.

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 29

1      You will notice from the Complaint that the
2  operative period is August through October 2005.
3      Do you see that?                 11:09:07
4    A.  Yes.
5    Q.  Now, the mail server, has that been in
6  place since at least August of 2005?       11:09:17
7    A.  Yes.
8    Q.  Let me have you put that Complaint aside
9  for a while, and I'll show you a document that I have  11:09:42
10  had marked as Exhibit 3.  It's Plaintiff's Response
11  -- withdraw that.
12      It's Plaintiff's Request for Admission, Set  11:09:50
13  One.
14      (Whereupon, Defendants' Exhibit 3 was
15  marked for identification.)             11:09:51
16  BY MR. CLARK:
17   Q.  Now, Mr. Phillips, you may not have seen
18  this document before, but let me ask you:    11:10:15
19      Have you seen this document before?
20   A.  I've seen many documents relating to all
21  this.  It's a little hard for me to keep track of  11:10:25
22  which one is which.
23   Q.  That's fine.  What I want to do is I want
24  to actually use this as a checklist of names.  And  11:10:36
25  what I would ask you to do, please, is to turn to

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

GROSSMAN & COTTER        (650) 324-1181              06AUG2806

b5cc5e24-d3ac-4436-aaa4-f02314997231

PHILLIPS   VS.   NETBLUE   RITCHIE PHILLIPS                    AUGUST 28, 2006

Page 30

1  Page 8. If you look at the top of the page, you will
2  see there's a heading Request Number 7.
3      Do you see that?          11:10:56
4      A. Yes.
5      Q. And then as part of that request, there's a
6  reference to, if you go down though Line 3, "e-mail   11:11:05
7  addresses at the e-mail server with domain names of
8  rdac.com," et cetera. Then there are a number of
9  names listed.                11:11:13
10     Do you see that?
11     A. Yes.
12     Q. Now, what are those names?       11:11:18
13     A. Those are domains that we house e-mail
14 servers for.
15     Q. And are those domains used to provide   11:11:41
16 e-mail service to customers?
17     A. Yes.
18     Q. Now, are those the only domains that you   11:11:51
19 host currently?
20     A. I think so.
21     MR. GRABOWSKI: Excuse me. You might want   11:12:03
22 to correct at the moment that "rdac" is incorrect.
23     THE WITNESS: Oh. It sure is. It's
24 spelled wrong.               11:12:09
25     MR. CLARK: Okay. Thank you, Richard.
       Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 31

1  BY MR. CLARK:
2      Q. Is that a typo? Should it be "radc"?
3      A. Yes.               11:12:15
4      Q. Subject to that correction, do you need to
5  change your testimony in any other way about whether
6  these are all of the domain names that you -- that   11:12:29
7  you offer services through?
8      A. I think this is all of them.
9      MR. CLARK: Let me have marked as Exhibit 4   11:13:14
10 a multi-page document that consists of a schedule of
11 what appears to be e-mails that were provided by -- I
12 think as part of plaintiff's initial disclosures in   11:13:30
13 this case.
14     (Whereupon, Defendants' Exhibit 4 was
15 marked for identification.)        11:13:30
16 BY MR. CLARK:
17     Q. Mr. Phillips, would you please look at
18 Exhibit 4.               11:13:58
19     Do you recognize that document?
20     A. Vaguely.
21     Q. What is your understanding of what that   11:14:12
22 document is?
23     A. Well, it's a list of e-mails that were
24 received by our servers.          11:14:21
25     Q. Were you involved in preparing this list?
       Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 32

1      A. This particular list?
2      Q. Yes.
3      A. No.               11:14:25
4      Q. Do you know who prepared it?
5      A. No.
6      Q. So you say that you understand this is   11:14:36
7  e-mails received by your servers.
8      Is that your understanding?
9      A. Yes.               11:14:40
10     Q. Do you know how -- what criteria were used
11 to select the e-mails that are listed on this Exhibit
12 4?                   11:14:55
13     A. Do I know the criteria?
14     Q. Yes.
15     A. No.               11:14:57
16     Q. Do you have any understanding with regard
17 to whether the senders described on this Exhibit 4
18 have any common characteristic?       11:15:20
19     A. Repeat that.
20     Q. Sure. Do you know what selection criteria
21 were used to determine who -- what senders to include   11:15:31
22 on this list? Were they advertising a particular
23 product?
24     MR. SINGLETON: He previously testified   11:15:34
25 that he does not know who prepared it. I think if
       Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 33

1  you want to ask him about the e-mails, you might want
2  to show him the actual printout of the e-mails so
3  that he has the header information and all the other   11:15:46
4  information for each individual e-mail.
5      I mean, all you have here is a list and a
6  date. You really don't have the e-mail itself.   11:15:55
7      MR. CLARK: I think I can just ask him what
8  he knows about this list. And if he says he doesn't
9  know anything about it, then I'll move on.   11:16:04
10     MR. SINGLETON: Do you understand the
11 question?
12     THE WITNESS: Well, repeat the last   11:16:06
13 question.
14     MR. CLARK: Let me rephrase it.
15 BY MR. CLARK:             11:16:11
16     Q. I understand that you don't know the
17 selection criteria that were used in creating this
18 list; is that correct?          11:16:18
19     A. Yes.
20     Q. But you have an understanding that this is
21 a list of e-mails that went through your servers?   11:16:23
22     A. Yes.
23     Q. What I'm trying to determine now is whether
24 you know what criterion was used to determine which   11:16:38
25 senders would be listed. For example, are these
       Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

GROSSMAN & COTTER          (650) 324-1181                    06AUG2806

b5cc5e24-d3ac-4436-aaa4-f02314997231

PHILLIPS   VS.   NETBLUE   RITCHIE PHILLIPS                    AUGUST 28, 2006

---

Page 34

1  senders listed because they were promoting a
2  particular product or a particular service or a
3  particular company?                              11:16:47
4       Do you know what the criterion was whereby
5  these senders were identified for incorporation in
6  this list?                                       11:16:55
7       A.  No, I don't.
8       Q.  Have you seen this list before today?
9       A.  I'm trying to recall whether I've seen this  11:17:06
10  particular list.  I can't recall whether I've seen
11  this particular list.  I've seen lists like these.
12      Q.  Let me show you another document, which     11:17:18
13  I'll have marked as Exhibit 5.  This is a further
14  multi-page list with columns showing the from
15  address, sender and recipient.                   11:17:31
16       (Whereupon, Defendants' Exhibit 5 was
17  marked for identification.)
18       MR. CLARK:  Do you want this to be marked   11:17:47
19  Attorneys' Eyes Only?
20       MR. SINGLETON:  I don't think so.  Well,
21  maybe.  These have the individual e-mail addresses.  11:17:52
22  So yeah, we're going to have to include this within
23  the protective order.
24       MR. GRABOWSKI:  This is the two.  You      11:17:59
25  realize you can't display this --

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

---

Page 35

1       MR. CLARK:  I understand.
2       MR. SINGLETON:  -- to the defendant?
3       MR. CLARK:  That's correct.  We're going to   11:18:07
4  mark this as Attorneys' Eyes Only.
5       Let me just say for the record that we have
6  a protective order in the case, and that protective  11:18:13
7  order provides for documents being designated Highly
8  Confidential - Attorneys' Eyes Only.  And as I
9  understand it, plaintiff has elected to mark this   11:18:24
10  document in that form, and therefore, it should be
11  separately bound, not bound as part of the main
12  transcript.                                      11:18:36
13       THE REPORTER:  What about the testimony
14  regarding the document?  Do you want that separately
15  bound?                                           11:18:36
16       MR. CLARK:  Let's see what the testimony
17  is.
18       THE REPORTER:  Sure.                        11:18:36
19       MR. CLARK:  But I think we will once we
20  talk about the individual accounts.
21  BY MR. CLARK:                                    11:18:36
22       Q.  Mr. Phillips, would you look at Exhibit 5.
23       Have you seen that document before?
24       A.  No.                                     11:19:02
25       Q.  Do you know who prepared this document?

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

---

Page 36

1       A.  I don't.
2       Q.  Would you look at the addresses in the
3  right-hand column.  You will notice that they're   11:19:17
4  addressed -- I believe all of those addresses are
5  addressed to one of the domain names that we
6  discussed earlier.                               11:19:26
7       Do you see that?
8       A.  No.  I believe I missed your --
9       Q.  Okay.  Look at the first line.  You will  11:19:33
10  notice it's addressed to an addressee at radc.com.
11      A.  Yes.
12      Q.  And radc.com is one of the domain names   11:19:42
13  that you manage; is that correct?
14      A.  Yes.
15      Q.  Now, there are other references there to,  11:19:46
16  for example, yuroktribe, ars-insurance, et cetera.
17      Do you see that?
18      A.  Yes.                                     11:19:51
19      Q.  Are all of the addresses in the extreme
20  right-hand column e-mail addresses that are addressed
21  through your service to the domain names that you   11:20:03
22  managed?
23      A.  Well, I wouldn't know that.  Some of these
24  could be just generated addresses.  Whether all of  11:20:13
25  these addresses are real or not, I can't speak to.

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

---

Page 37

1  These domains are our domains.
2       Q.  One of the domains is bsmall.com.
3       Do you see that?                             11:20:28
4       A.  Yes.
5       Q.  And Brian Small was your former employee;
6  is that correct?                                 11:20:33
7       A.  Yes.
8       Q.  Is bsmall -- is the domain bsmall somehow
9  connected to Mr. Brian Small?                    11:20:41
10      A.  Yes.
11      Q.  In what way?
12      A.  It's his Web site.                       11:20:44
13      Q.  Okay.  Next, let me show you a document
14  that I will have marked as Exhibit 6.  It's a
15  three-page schedule with e-mail addresses on it.   11:21:07
16       MR. SINGLETON:  Likewise, we would identify
17  this document as one falling within the protective
18  order.                                           11:21:16
19       MR. CLARK:  Okay.  So this will also be
20  marked as Attorneys' Eyes Only and be dealt with in
21  the same way as Exhibit 5.                       11:21:23
22       (Whereupon, Defendants' Exhibit 6 was
23  marked for identification.)
24  BY MR. CLARK:                                    11:21:30
25       Q.  Mr. Phillips, I don't expect you to have

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

---

GROSSMAN & COTTER        (650) 324-1181                    06AUG2806

b5cc5e24-d3ac-4436-aaa4-f02314997231

PHILLIPS   VS.   NETBLUE   RITCHIE  PHILLIPS                    AUGUST 28, 2006

Page 38

1  seen Exhibit 6. It was something that was prepared
2  in my office which reflects the names from Exhibit 5
3  and the number of times those names appear on Exhibit 11:21:58
4  5.
5     A. Oh.
6     Q. So the first e-mail address -- I won't give 11:22:08
7  on the record the actual e-mail address because
8  Mr. Pilch is in the room and I believe and you want
9  this to be designated Attorneys' Eyes Only.      11:22:18
10       But can you tell me from looking at that
11 e-mail address who the -- who that person is who has
12 the first e-mail address?           11:22:27
13    A. Could I tell you? Yeah, sure, I can tell
14 you.
15    Q. Who is that person?          11:22:33
16    A. That's not a person.
17       MR. SINGLETON: Yeah. First off, you're
18 not -- let me back up.            11:22:40
19       You're only entitled to get that matter
20 that's relevant to the subject matter of the action.
21 And who his individual clients are, not only is it  11:22:48
22 protected business information, but it's not relevant
23 to the subject matter of the action.
24       Now, if you want to explain to me how the  11:22:54
25 names of his individual clients are relevant to this

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 39

1  case, if you can convince me of that, then I'll allow
2  him to answer the question. But I'm not going to
3  allow you to find out the names of all his individual 11:23:06
4  clients.
5       MR. CLARK: Well, I assume that you're
6  going to present evidence at some stage that some    11:23:14
7  individual applied for a prize and was not awarded
8  that prize, and that you're going to use that
9  testimony to allege that information on a subject    11:23:26
10 line was not true. That's certainly the position
11 you've put in your interrogatory responses, that the
12 reason why the sender line is false is because it    11:23:37
13 promised gifts that weren't available.
14       MR. GRABOWSKI: Can I answer?
15       MR. CLARK: Sure. So that's the relevance. 11:23:44
16       The question -- I want to check with
17 anybody to find out if anybody has applied for a
18 prize and has not been awarded the prize. And if    11:23:55
19 they have been awarded their prize, then obviously
20 the allegation in the interrogatory response is
21 unsupported by evidence.           11:24:02
22       That's my tender of proof.
23       MR. SINGLETON: There will be evidence
24 presented that people did not receive the prize and  11:24:09
25 that it was a pattern of practice that in fact

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 40

1  NetBlue is not awarding prizes. I don't believe it's
2  going to come from R&D Computers' clients, which is
3  really irrelevant.             11:24:16
4       Do you want to respond, Richard?
5       MR. GRABOWSKI: Two issues. One, we aren't
6  going to present anything from Mr. Phillips' clients 11:24:29
7  directly.
8       I think, secondly, the law here is that it
9  is either objective --             11:24:44
10       MR. CLARK: Should we go off the record and
11 do this? We don't need to do this on the record. Or
12 unless you want to --             11:24:48
13       MR. GRABOWSKI: Basically it's a statutory
14 issue.
15       MR. SINGLETON: Yeah. Why don't you --  11:24:54
16 I'll continue to instruct my client not to answer the
17 question. So that's where we're at.
18       MR. CLARK: Okay. Let's go off the record. 11:25:03
19 We may have to call the court.
20       THE VIDEOGRAPHER: We are off the record.
21 The time is 11:25.             11:25:10
22       (Discussion off the record.)
23       THE VIDEOGRAPHER: We are back on the
24 record. The time is 11:32.           11:32:04
25       MR. CLARK: Let me just say for the record

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 41

1  that my colleague, Christine Watson, is trying to get
2  ahold of the court so we can have a hearing on the
3  discovery issue which just arose. But in the     11:32:16
4  meantime, I'm going to press on with other matters.
5  BY MR. CLARK:
6     Q. Actually, let me keep you on Exhibit 5,   11:32:26
7  please, Mr. Phillips. I'll ask you about different
8  topics but still on that exhibit.
9       Do you know whether any of the e-mail    11:32:38
10 address holders listed on Exhibit 5 actually applied
11 for some award and was unable to receive that award?
12       MR. SINGLETON: You're referring to the   11:32:50
13 column on the far right-hand side?
14       MR. CLARK: Yes.
15       THE WITNESS: You want me to answer that?  11:33:03
16       MR. SINGLETON: Yeah. If you know.
17 There's hundreds of people here. How would you know
18 if they ever did or not? I don't know.        11:33:09
19       THE WITNESS: No, I don't know in
20 particular.
21 BY MR. CLARK:                11:33:15
22    Q. Have you personally ever applied for an --
23 withdraw that.
24       Have you ever personally applied to a    11:33:26
25 NetBlue Web site for an award and been refused that

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

11 (Pages 38 to 41)

b5cc5e24-d3ac-4436-aaa4-f02314997231

PHILLIPS   VS.   NETBLUE   RITCHIE PHILLIPS                    AUGUST 28, 2006

Page 42

1  award?
2      A.  No.
3      Q.  Do you have knowledge whether any of the   11:33:42
4  holders of the e-mail addresses listed on the
5  right-hand column of Exhibit 5 have consented to
6  receive commercial e-mail from NetBlue or its        11:33:55
7  affiliates?
8      A.  I don't have that kind of relationship with
9  any of these people.  I wouldn't know those things.   11:34:02
10     Q.  Have you ever discussed with any of your
11  e-mail clients whether they have consented to receive
12  commercial e-mail, either from NetBlue or from its    11:34:16
13  affiliates?
14     A.  I know of no one who willingly consented.
15  I think there are people who have been tricked into   11:34:26
16  consenting, but I know of no one who knowingly and
17  willingly consented to receive spam, no.
18         MR. SINGLETON:  Or any commercial e-mail.   11:34:34
19         THE WITNESS:  No.  I don't personally know
20  of anybody who has ever did that on purpose.
21  BY MR. CLARK:                              11:34:39
22     Q.  Okay.
23     A.  I'm sure there are people, but I don't know
24  them.                                    11:34:42
25     Q.  You expressed the -- you speculated that
          Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 43

1  somebody had been tricked.
2         What information do you have that anyone
3  was tricked into consenting to receive commercial   11:34:52
4  e-mail?
5      A.  I don't have any particular evidence.
6  You're asking me?                          11:35:00
7      Q.  Yes.
8      A.  Okay.
9      Q.  Have you ever discussed with any of the   11:35:06
10  e-mail account holders that you service whether that
11  account holder has not been awarded a prize that they
12  felt they were entitled to?                   11:35:18
13     A.  I don't recall ever discussing that with
14  any of them.
15     Q.  Now, what was it that made you decide that   11:35:39
16  your Complaint would only focus on 1,500 e-mails
17  between August and October of 2005?
18         MR. SINGLETON:  I don't even understand the   11:35:49
19  question, really.  Do you understand it?
20         THE WITNESS:  Why those particular e-mails?
21         MR. CLARK:  I'll change the question.       11:35:55
22  BY MR. CLARK:
23     Q.  You understand, don't you, Mr. Phillips,
24  that this Complaint relates to 1,500 e-mails that   11:36:01
25  were allegedly sent between August and October of
          Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 44

1  2005.
2         Do you know that?
3      A.  Yes.                              11:36:06
4      Q.  Why is it that when you filed this lawsuit
5  you decided to focus on those 1,500 e-mails?
6      A.  I didn't make the decision to focus on       11:36:27
7  those 1,500 e-mails, so I can't really speak to that.
8      Q.  Okay.  Who made that decision?
9      A.  I don't know.                         11:36:32
10     Q.  What was it that caused you to file this
11  lawsuit?  Did you have a complaint -- withdraw that.
12         Did you get a complaint from any of the     11:36:45
13  account holders that you offer e-mail to about
14  commercial e-mail from NetBlue or its affiliates?
15     A.  Daily, for years.                      11:36:56
16     Q.  Okay.  When did you first get a complaint?
17  Are you talking about NetBlue and its affiliates
18  specifically?                             11:37:06
19     A.  I may have answered that a little quickly.
20  I thought you were asking me if I got complaints from
21  my customers about unsolicited e-mail.  And I get it   11:37:17
22  all the time.
23     Q.  What I want to focus on is whether you had
24  a complaint specifically with regard to NetBlue or    11:37:21
25  any of its affiliates.
          Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 45

1         MR. SINGLETON:  It's not relevant to the
2  subject matter of the action.
3         But I'll allow him to answer the question.   11:37:32
4         THE WITNESS:  No.
5         MR. CLARK:  Can you read back the question
6  again, please.                            11:38:12
7         (Record read.)
8         THE WITNESS:  You're asking me did someone
9  call up and specifically name NetBlue as somebody   11:38:26
10  that was irritating them?
11  BY MR. CLARK:
12     Q.  Yes.                              11:38:29
13     A.  And I have not had a specific call of that
14  nature, no.
15     Q.  Do you recall whether any of the specific   11:38:42
16  holders of the accounts listed in the right-hand
17  column of Exhibit 5 complained about any of the
18  1,500 e-mails that are in Exhibit 5?              11:38:53
19         MR. SINGLETON:  Asked and answered.  It
20  would be within the gambit of the last question.
21         You may answer.                      11:38:56
22         THE WITNESS:  No.
23  BY MR. CLARK:
24     Q.  So none of the e-mail account holders in   11:39:05
25  Exhibit 5 complained specifically about NetBlue; is
          Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

12 (Pages 42 to 45)

GROSSMAN & COTTER      (650) 324-1181                  06AUG2806

b5cc5e24-d3ac-4436-aaa4-f02314997231

PHILLIPS   VS.   NETBLUE   RITCHIE PHILLIPS                    AUGUST 28, 2006

---

Page 46

1   that correct?
2          MR. SINGLETON: Asked and answered. Don't
3   answer it again. He's already answered that        11:39:15
4   question.
5          MR. CLARK: I'm just trying to clarify
6   where we are here. You can't instruct him except on  11:39:20
7   privilege grounds or harassment. He's not being
8   harassed.
9          MR. SINGLETON: Well --               11:39:23
10         MR. CLARK: I'm trying to summarize --
11         MR. SINGLETON: This is like the fourth
12  time to you tried to ask the same question one way or  11:39:28
13  the other. I will allow him to answer the question
14  one more time and then I will instruct him not to
15  answer. You cannot ask the same question five times.  11:39:36
16         One last time, you may answer the question.
17  BY MR. CLARK:
18     Q. I just want to clarify your testimony.     11:39:41
19         And is it your testimony that none of the
20  people holding the accounts on Exhibit 5 made a
21  complaint about NetBlue or its affiliates? Was that  11:39:55
22  your testimony?
23     A. I don't know all of NetBlue's affiliates,
24  so I couldn't answer that question.              11:40:00
25     Q. Okay.
          Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

---

Page 47

1      A. I haven't had any particular complaints
2   specifically about NetBlue because the complaints
3   don't come to me in that form.                  11:40:11
4      Q. Okay. Did you have any complaints from
5   anybody with regard to a company called YFDirect?
6      A. No.                              11:40:18
7      Q. Did you have a complaint from any of the
8   people listed on Exhibit 5 -- withdraw that.
9          Did you have a complaint from any of the  11:40:27
10  e-mail account holders listed on the right-hand
11  column of Exhibit 5 with regard to any of the e-mails
12  that are listed in that exhibit?                11:40:39
13     A. I missed that question.
14         MR. SINGLETON: Yeah, me too.
15  BY MR. CLARK:                          11:40:42
16     Q. Okay. I'm not now talking about NetBlue.
17  I'm now talking about just these e-mails.
18         Irrespective of who these e-mails came    11:40:50
19  from, did you have a complaint from any of the
20  account holders of the e-mails listed on Exhibit 5
21  about these e-mails in Exhibit 5?              11:40:57
22     A. I may have. I don't recall.
23         MR. SINGLETON: Same objection, by the way.
24         MR. CLARK: Let me have marked as Exhibit 7  11:41:40
25  a compilation of e-mails. It's a multi-page
          Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

---

Page 48

1   document. The top document is an e-mail from Real
2   Rewards to an addressee at yuroktribe.
3          MR. SINGLETON: Again, this would also be a  11:41:55
4   document that's to be included within the protective
5   order and marked for Attorneys' Eyes Only.
6          (Whereupon, Defendants' Exhibit 7 was     11:42:01
7   marked for identification.)
8          MR. CLARK: Actually, this is probably --
9   are you going to let the witness tell me who the    11:42:27
10  addressees are, the individuals behind these e-mail
11  addresses?
12         MR. SINGLETON: You mean the name of the   11:42:38
13  individuals who hold the e-mail accounts?
14         MR. CLARK: Yes.
15         MR. SINGLETON: No.             11:42:42
16         MR. CLARK: Okay. Well, we'll have to
17  leave that over until we've talked to the judge as
18  well.                            11:43:21
19  BY MR. CLARK:
20     Q. Mr. Phillips, did any of the holders of the
21  e-mail accounts on Exhibit 5 ask you to file this    11:43:26
22  lawsuit?
23     A. No.
24     Q. Was that a -- was the decision to file this  11:43:35
25  lawsuit one that you made independently on your own?
          Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

---

Page 49

1      A. Let me correct my last question. I don't
2   know emphatically that no one asked me to. I have
3   numerous complaints about the whole flood of junk   11:43:49
4   that comes in from e-mail from people all the time.
5   Whether at any time people asked me or spoke to me
6   desired to see those people sued, I don't recall. I  11:44:03
7   very likely could have.
8      Q. Okay. So was it your decision to file this
9   lawsuit?                          11:44:11
10     A. Yes.
11     Q. And what was your reason for filing the
12  lawsuit?                          11:44:18
13         MR. SINGLETON: Objection. It's not
14  relevant to the subject matter of the action.
15         However, you may answer. Why did you file  11:44:23
16  the suit?
17         THE WITNESS: Because these people drive me
18  nuts.                            11:44:30
19         MR. SINGLETON: Among other reasons. Sucks
20  up your bandwidth.
21         MR. CLARK: Well, let's let the witness     11:44:35
22  testify.
23         THE WITNESS: It takes day in and day out
24  to deal with this whole mess.                11:44:39
25  BY MR. CLARK:
          Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

---

13 (Pages 46 to 49)

GROSSMAN & COTTER        (650) 324-1181                    06AUG2806

b5cc5e24-d3ac-4436-aaa4-f02314997231

PHILLIPS   VS.   NETBLUE   RITCHIE PHILLIPS                    AUGUST 28, 2006

---

Page 50

1    Q.  What investigation did you personally
2  conduct with regard to the 1,500 e-mails listed on
3  Exhibit 5?                              11:44:48
4        MR. SINGLETON:  Calls for a narrative.
5  Vague and ambiguous.  What kind of investigation?
6        MR. CLARK:  Any investigation at all.    11:44:53
7  BY MR. CLARK:
8    Q.  Did you sit down with a pen and paper and
9  make notes?  What did you personally do?    11:45:01
10   A.  I have traced back many of these e-mails
11  looking for source, going in and out of the various
12  deceptive practices to try to hide where it came    11:45:12
13  from, trying to hunt them down.  I've spent a lot of
14  time doing that.
15   Q.  Okay.  So with respect to the e-mails at    11:45:16
16  issue in this case -- now, let me back up.  I'm going
17  to focus on this case.
18       You have filed other lawsuits under    11:45:23
19  Can-Spam, have you not?
20   A.  I think one other one, yeah.
21   Q.  Okay.  I don't want to talk about any of    11:45:27
22  the other lawsuits, not now, anyway.
23       What I want to know is what investigation
24  you did about the 1,500 e-mails that are alleged in    11:45:34
25  this lawsuit to constitute spam?
         Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

---

Page 51

1    A.  Well, as I stated, I've tried to follow up
2  on the source of many of these e-mails.  Whether this
3  particular one or not, I don't know.  This was a year    11:45:52
4  ago or almost a year ago that we're talking about.  I
5  do this every day so --
6    Q.  So can you affirmatively say that you    11:46:04
7  investigated any of the senders on this list, Exhibit
8  5?
9    A.  Repeat the question.    11:46:12
10   Q.  Sure.  Let me ask you, first of all, what
11  kind of investigation did you do into the senders?
12  Did you go onto a -- do a Whois search, W-h-o-i-s?    11:46:23
13   A.  Among other things.
14   Q.  Okay.  What other things did you do to
15  identify who the senders were?    11:46:29
16   A.  Well, there's a variety of things.  But do
17  I need to answer this?
18       MR. SINGLETON:  I don't see its relevance,    11:46:38
19  but --
20       THE WITNESS:  Did you want me to teach you
21  about IP addressing or --    11:46:41
22  BY MR. CLARK:
23   Q.  No.  I want you to tell me what you did to
24  investigate the allegations in this Complaint.    11:46:44
25   A.  I get these kinds of e-mails on a daily
         Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

---

Page 52

1  basis.  Some of them are more odious than others, and
2  I try to block them out of our system.  And so I have
3  various tools at my disposal to try to find out where    11:47:06
4  they're coming from, from trace routes to Whois to
5  DNS reverse look-ups.  There's a variety of tools
6  that I use to try to find them out.  Sometimes it's    11:47:19
7  frustrating; I can't find them out.
8    Q.  Now, did you use any of those tools with
9  respect to any of the senders that are listed on    11:47:26
10  Exhibit 5?
11       MR. SINGLETON:  Asked and answered.  He
12  said he probably did but could not recall because    11:47:31
13  it's been more than a year ago.
14  BY MR. CLARK:
15   Q.  Is that your answer?    11:47:36
16       MR. SINGLETON:  I'll let him answer the
17  question again.
18       THE WITNESS:  Well, yeah, you're asking me    11:47:38
19  about specific e-mails.  And number one, I'd have to
20  say that I looked through every one of these e-mails
21  to see if there's one of them that I did or didn't,    11:47:44
22  and I'd have to remember that specific e-mail from a
23  year ago.  So I don't -- I'm not able to do that.
24  BY MR. CLARK:    11:47:50
25   Q.  So you're unable to do that as you sit here
         Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

---

Page 53

1  today?
2    A.  Yes.
3    Q.  Okay.  Did you maintain any notes of any    11:47:59
4  investigation of the kind you described into any of
5  the sender addresses that are shown on Exhibit 5?
6    A.  No.    11:48:05
7    Q.  Did you create any reports to be given to
8  anybody else on your investigations with respect to
9  the 1,500 e-mails in this case?    11:48:14
10   A.  No.
11   Q.  Did any of your investigations lead you to
12  conclude that NetBlue had itself sent any of the    11:48:41
13  e-mails, the 1,500 e-mails at issue in the case?
14   A.  Yes.
15   Q.  What was the basis for that conclusion?    11:48:48
16   A.  I think it's pretty well laid out in these
17  papers.
18       MR. SINGLETON:  You mean that -- rephrase    11:48:55
19  the question.  Do you mean that NetBlue is behind it
20  because their ad was in the body of the e-mail or
21  that the actual IP --    11:49:02
22       MR. CLARK:  Mr. Singleton, would you let
23  the witness testify?
24       MR. SINGLETON:  Well, I don't understand    11:49:06
25  the question.
         Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

---

GROSSMAN & COTTER        (650) 324-1181                    06AUG2806

b5cc5e24-d3ac-4436-aaa4-f02314997231

PHILLIPS   VS.   NETBLUE   RITCHIE PHILLIPS           AUGUST 28, 2006

Page 54

1    MR. CLARK: Frankly, that's not the
2  problem. The problem is whether the witness
3  understands the question. I don't care whether you  11:49:10
4  understand it. If he understands it, he can answer
5  it.
6    MR. SINGLETON: Do you understand the   11:49:13
7  question?
8    THE WITNESS: No. Why don't you repeat it
9  to me again.                      11:49:15
10 BY MR. CLARK:
11   Q. Okay. My question was: Did you from your
12 investigations conclude that NetBlue had sent any of  11:49:20
13 the 1,500 e-mails at issue in the case?
14   A. Once again, you're asking about an issue
15 that happened a year ago and that are specific --  11:49:30
16 you're talking about specific e-mails. So I can't
17 really -- you know, I don't know.
18   Q. Okay. Did you conclude from your   11:49:44
19 investigations that any of the individual defendants
20 had sent any of the 1,500 e-mails?
21   A. I didn't get that. Say it again.  11:49:52
22   Q. Okay. Why don't you have a look at the
23 Complaint?
24   A. My ears are slightly plugged. So if you   11:50:00
25 speak up a little bit, it will help me.

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 55

1    Q. I'll try. Would you have a look at Exhibit
2  2. Let's have you look at that exhibit at Paragraph
3  9 again. And I'll just refer you to the opening   11:50:25
4  phrase which says --
5    A. What page is that on?
6    Q. Page 4, Paragraph 9, Line 6.      11:50:32
7    A. Okay.
8    Q. And it says, "Plaintiff alleges that
9  defendants sent or caused to have sent in excess of  11:50:38
10 1,500 e-mails."
11   Do you see that?
12   A. Yes.                      11:50:41
13   Q. And if you look at the first page, you will
14 see there's a list of all the defendants, and they
15 include Mr. Chan and Mr. Chin, Mr. Rewick and   11:50:50
16 Mr. Pilch and Mr. Harman.
17   Do you see that?
18   A. Yes.                      11:50:52
19   Q. Now, and the allegation is that the
20 defendants sent or caused to have sent those e-mails,
21 those 1,500 e-mails.                  11:51:01
22   Do you understand that?
23   A. Yes.
24   Q. Now, what I'm asking you now is: Do you   11:51:04
25 have -- and I'll pick one of individual defendants --

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 56

1  did your investigations reveal to you that Mr. Chan
2  had sent any of the 1,500 e-mails?
3    MR. SINGLETON: Or caused to have sent?   11:51:17
4    MR. CLARK: Counsel, may I ask the
5  questions?
6    MR. SINGLETON: Go right ahead.      11:51:20
7    MR. CLARK: Thank you.
8  BY MR. CLARK:
9    Q. The question is: Do you have any evidence  11:51:24
10 that Mr. Chan sent any of the 1,500 e-mails?
11   A. Well, I think that evidence is in, been
12 presented over and over in these papers. I mean,   11:51:34
13 it's long and -- I'm not sure what you want me to
14 answer.
15   Q. I just want to know whether you have   11:51:40
16 personal knowledge whether or not Mr. Chan sent any
17 of the 1,500 e-mails.
18   A. My personal knowledge of that side of the   11:51:47
19 case, no.
20   Q. Do you have any personal knowledge that
21 Mr. Rewick sent any of the e-mails?      11:51:52
22   A. No.
23   Q. Do you have personal knowledge that
24 Mr. Pilch sent any of the e-mails?        11:51:55
25   A. No.

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 57

1    Q. Do you have personal knowledge that
2  Mr. Harman sent any of the e-mails?
3    A. No.                      11:52:00
4    Q. Now, the other allegation in Paragraph 9 is
5  that defendants caused to have sent in excess of
6  1,500 e-mails.                    11:52:07
7    Do you see that?
8    A. Yes.
9    Q. Now, do you have any evidence that NetBlue  11:52:10
10 caused anyone to send the 1,500 e-mails at issue in
11 the case?
12   A. Now, you asked me a different question this  11:52:18
13 time than you asked me last time.
14   Q. That's right. Yes, I'm doing it
15 deliberately.                     11:52:27
16   A. I served -- I mean, we have -- we have what
17 we've submitted to the court as evidence. Is that
18 what you're asking?                  11:52:31
19   Q. Yes. Mr. Phillips, if you don't know, you
20 can tell me that. I mean, all I want to know is what
21 Ritchie Phillips knows about this case. And either   11:52:39
22 you know it or you don't know it and then we move on.
23 So that's my question.
24   Do you personally have evidence which you   11:52:46
25 believe shows that NetBlue caused to have sent in

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

15 (Pages 54 to 57)

GROSSMAN & COTTER      (650) 324-1181           06AUG2806

b5cc5e24-d3ac-4436-aaa4-f02314997231

PHILLIPS   VS.   NETBLUE   RITCHIE PHILLIPS          AUGUST 28, 2006

---

Page 58

1  excess of 1,500 e-mails in this case?
2      MR. SINGLETON:  You're asking him for his
3  thought processes about what's contained in the      11:52:56
4  e-mails?
5      MR. CLARK:  No.  It's a simple question.
6  BY MR. CLARK:                          11:52:58
7    Q.  Do you have --
8      MR. SINGLETON:  Okay.  Calls for expert
9  testimony.  I'll object.  Calls for expert testimony  11:53:02
10  prior to the time for disclosure of expert witnesses.
11      MR. CLARK:  Okay.
12      MR. SINGLETON:  Also calls for a narrative.  11:53:06
13  Calls for attorney work product.  Calls for a legal
14  conclusion.
15      I'll allow you to answer.            11:53:12
16  BY MR. CLARK:
17    Q.  Do you have the question in mind?
18    A.  I think you're asking me -- the basis of   11:53:17
19  what you're asking me is did I do all the personal
20  research?  Do I know all the personal names?  Do I
21  have a personal, intimate knowledge of every one of  11:53:27
22  these e-mails and they work and how they violated the
23  law?  No, I don't.
24    Q.  Well, I'm not asking you that, sir.  My   11:53:32
25  question is very simple.

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

---

Page 59

1      Do you have any information personally that
2  NetBlue caused to have sent the 1,500 e-mails at
3  issue --                               11:53:44
4    A.  Well, I think I do.
5    Q.  -- in this case?
6    A.  Excuse me for not letting you finish.  But  11:53:47
7  I think I do.  I think it's stated in these papers.
8  Do I have that evidence?  Yes.  Do I have it in my
9  pocket?  Do I have it in my mind?  I'm not sure what  11:53:53
10  you're asking me.
11    Q.  I'm asking you if you have it in your mind,
12  if you have it in your pocket.              11:53:57
13    A.  I have it in these papers.
14    Q.  Okay.  Apart from --
15    A.  Yes, I do.                       11:54:00
16    Q.  Okay.  In addition to what's in the papers,
17  do you have any information that NetBlue caused to
18  have sent the 1,500 e-mails that are at issue in this  11:54:10
19  case?
20    A.  Not to my knowledge.
21    Q.  Do you have any information that Mr. Chan   11:54:16
22  caused to have sent the 1,500 e-mails in this case?
23    A.  We have the information in these documents.
24    Q.  Apart from the information in those       11:54:24
25  documents, do you have any information that Mr. Chan

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

---

Page 60

1  caused to have sent in excess of 1,500 e-mails?
2    A.  No, not that I'm aware of.
3    Q.  Do you have any information that Mr. Rewick  11:54:45
4  caused to have sent any of the 1,500 e-mails at issue
5  in this case?
6      MR. SINGLETON:  Apart from the documents?  11:54:54
7  You quit using -- at one point you were using apart
8  from the documents and then you quit using that
9  qualifier in your question.              11:55:00
10      MR. CLARK:  I want to know what he knows.
11  I don't care what's in the documents.
12  BY MR. CLARK:                          11:55:03
13    Q.  My question is:  What do you know, sir?
14      MR. CLARK:  And if he wants to preface all
15  his answers by saying "what's in the documents,"    11:55:08
16  that's fine.  I guess he can do that.  He can avoid
17  the question if he wants to.
18  BY MR. CLARK:                          11:55:12
19    Q.  I'm asking:  Do you, sir, have information
20  that Mr. Rewick sent any of the -- withdraw that.
21      Do you have information that Mr. Rewick     11:55:19
22  caused to have sent any of the 1,500 e-mails?
23    A.  We have that information in these
24  documents.                           11:55:24
25    Q.  "We."  I'd like to know what you, sir,

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

---

Page 61

1  have.
2    A.  I have these documents.  These are all
3  mine.                                11:55:30
4    Q.  And everything you have is in the
5  documents; is that correct?
6    A.  As far as I know.                 11:55:34
7    Q.  Okay.  With respect to Mr. Pilch, do you
8  have any information that Mr. Pilch caused to have
9  sent any of the 1,500 e-mails?              11:55:45
10    A.  I have that information in these documents.
11    Q.  Okay.  What is it in the documents that
12  provides information that Mr. Pilch caused to have  11:55:53
13  sent --
14      MR. SINGLETON:  Hold on.  Calls for a legal
15  conclusion.  Calls for disclosure of expert witness  11:56:01
16  information.
17      And I'll instruct you not to answer.  The
18  documents speak for themselves.  You may answer --  11:56:07
19      MR. CLARK:  The documents don't speak for
20  themselves.
21  BY MR. CLARK:                          11:56:11
22    Q.  What is it in the documents that would
23  explain to me what the basis is for your allegation
24  that Mr. Pilch caused any of these 1,500 e-mails to  11:56:21
25  be sent out?

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

---

16 (Pages 58 to 61)

b5cc5e24-d3ac-4436-aaa4-f02314997231

PHILLIPS   VS.   NETBLUE   RITCHIE PHILLIPS          AUGUST 28, 2006

Page 62

1       MR. SINGLETON:  It also calls for attorney
2  work product.
3       If you care to give an answer, you may.     11:56:26
4       THE WITNESS:  Well, I think we're gathered
5  in here in a legal hearing.  So we all want to be
6  careful what we say, not knowing what it will mean.  11:56:36
7       I can tell you that I'm not a lawyer.  And
8  so I don't lay this out in a format that's fit for
9  the court.  I have trusted attorneys that do that.  11:56:53
10 And so I can't speak to how this is laid out in a
11 legal document.
12 BY MR. CLARK:                      11:57:00
13    Q.  Mr. Phillips --
14    A.  Does that make sense?
15    Q.  Well, I hear what you say, but I'm asking   11:57:04
16 you a simple question.  And the simple question is:
17 What information do you have that Mr. Pilch was
18 involved in sending out those 1,500 e-mails?        11:57:12
19      MR. SINGLETON:  It's a different question
20 than the last one, but go ahead.
21      THE WITNESS:  Well, that information is all  11:57:17
22 in here.  Other than the information that's in here,
23 I have none.
24 BY MR. CLARK:                      11:57:22
25    Q.  Let me ask you the same question with
         Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 63

1  respect to Mr. Harman.
2       Do you have any information that Mr. Harman
3  was involved in any way in sending out the 1,500    11:57:30
4  e-mails at issue in this case?
5       MR. SINGLETON:  Not relevant to the subject
6  matter of the action since Mr. Harman is now subject 11:57:35
7  to a settlement agreement.
8       MR. CLARK:  Which has not yet been signed.
9  So until it's signed and the action is dismissed,   11:57:41
10 it's relevant.
11 BY MR. CLARK:
12    Q.  You can answer the question.        11:57:43
13    A.  Other than what's in these documents,
14 there's no evidence that I am aware of.
15    Q.  Still on Exhibit 2, sir, which is the    11:57:56
16 Complaint, would you please look at Paragraph 7.
17 That paragraph reads, quote, "Plaintiff is informed
18 and believes that all named defendants, including   11:58:15
19 Does one to 50, inclusive, conspired to commit the
20 acts described herein, or alternatively, aided and
21 abetted one another in the performance in the       11:58:26
22 wrongful acts hereinafter alleged." End of quotes.
23      Do you see that paragraph?
24    A.  Yes, I do.              11:58:30
25    Q.  Do you personally have any information that
         Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 64

1  the defendants conspired among themselves to commit
2  any of the acts described in the Complaint?
3     A.  Other than what's in this -- these        11:58:42
4  documents, no.
5     Q.  Okay.  Do you have any information that any
6  of the defendants aided and abetted one another to  11:58:50
7  perform the acts alleged in the Complaint?
8     A.  No.  Other than what's in these documents,
9  no.                            11:58:58
10    Q.  Would you please turn to Paragraph 10 of
11 the Complaint.  And that reads, quote, "Plaintiff
12 alleges that defendants transmitted in excess of    11:59:14
13 1,500 e-mail advertisements containing and
14 accompanied by falsified, misrepresented, or forged
15 header information." End of quotes.        11:59:24
16      Do you see that?
17    A.  I'm lost.  Where are we at?
18    Q.  On Page 4, starting at Line 9.        11:59:37
19      Do you have the paragraph in front of you?
20    A.  I believe so.
21    Q.  Okay.  What I want to ask you is:  Do you   11:59:43
22 have any information that the header information on
23 any of the 1,500 e-mails was falsified?
24    A.  Well, I think there's information in these  11:59:53
25 documents, yes.
         Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 65

1     Q.  Okay.  Apart from anything that might be in
2  the documents, do you personally have any information
3  that any of the header information is falsified?     12:00:04
4     A.  No.
5     Q.  Apart from anything that may be in the
6  documents, do you have any information personally     12:00:11
7  that any misrepresentation was made in any header
8  information?
9     A.  Well, this question is starting to wear on  12:00:23
10 me a little bit.  You're being repetitive in your
11 questions and you're asking the same question over
12 and over.                       12:00:30
13      And I think I made it clear that the
14 information we have is in these documents, has been
15 disclosed, and I have no others.          12:00:35
16    Q.  You have been patting that pile of
17 documents for some while.  Let me say for the record
18 what those documents are.  They consist of Plaintiff  12:00:42
19 Request for Admission, which is Exhibit 3.  They
20 consist of Exhibit 5, Exhibit 4, Exhibit 7, and
21 Exhibit 6.                      12:00:52
22      Is that correct, sir?
23    A.  No.
24      MR. SINGLETON:  If I may interject.  Do you  12:00:57
25 really want him to go through the header and subject
         Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

17 (Pages 62 to 65)

b5cc5e24-d3ac-4436-aaa4-f02314997231

PHILLIPS   VS.   NETBLUE   RITCHIE PHILLIPS                    AUGUST 28, 2006

Page 66

1  line and all this stuff in the e-mail and explain how
2  it's bounced off an ISP and how you can't -- do you
3  want that kind of technical information from him? If  12:01:06
4  so, then ask for it.
5       MR. CLARK: I want to know what information
6  he has that any of the e-mails contained information  12:01:13
7  that was misrepresented. And I want him to simply
8  answer that question.
9       THE WITNESS: I've gone through -- I've  12:01:19
10  walked through some of these e-mails with my
11  attorneys. I've been involved with them in walking
12  through the trace routes and following your offer of  12:01:33
13  prizes to see where it goes.
14       And so I'm not sure what you're asking me
15  when you say "personal information." I don't know  12:01:40
16  what that means. All of the information that we
17  have, we've laid out in these documents and offered
18  to you. Other than that information, I have nothing.  12:01:47
19  So I don't know what you want.
20  BY MR. CLARK:
21     Q.  You see, you keep using the word "we,"  12:01:51
22  which presumably means you and your counsel and
23  whoever knows else. It is not their deposition
24  today; it's your deposition. I want to know what you  12:01:59
25  personally know, and that's my point. If you don't

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 67

1  know, if somebody else knows it, then I'll ask
2  somebody else. But you have made an allegation in
3  the Complaint that header information was falsified,  12:02:11
4  misrepresented and forged.
5     A.  Yes.
6     Q.  And I asked you what information you had to  12:02:17
7  say that it was falsified, and you told me it was in
8  those documents. Now I'm taking the second word in
9  your Complaint, which is the allegation that the  12:02:26
10  header information misrepresented something --
11     A.  Yes.
12     Q.  -- and I'm asking: What was it, according  12:02:30
13  to your information, that was misrepresented?
14     A.  Well, I don't think that's a simple answer.
15  I don't know what you want.  12:02:36
16     Q.  I want to know what information you have
17  that supports your allegation that --
18     A.  That --  12:02:41
19     Q.  -- the header information was
20  misrepresented.
21     A.  That information is laid out in detail in  12:02:44
22  these documents. And so other than the information
23  that's laid out in detail in these documents and is
24  explained thoroughly in these documents, I have no  12:02:52
25  additional information.

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 68

1       MR. SINGLETON: And again, I will object to
2  this entire line of questioning as calling for expert
3  witness testimony. We intend to call a witness who  12:03:00
4  will testify in detail about the technical aspects of
5  the e-mail and how it was false and how it
6  misrepresented, how the subject line was incorrect,  12:03:08
7  and all of that.
8       So you're asking for expert witness
9  testimony from someone who has not been designated as  12:03:14
10  an expert.
11       MR. CLARK: I'm asking for this witness's
12  knowledge about allegations that --  12:03:18
13       MR. SINGLETON: Well, my objections stand
14  and I'll allow him to answer.
15       THE WITNESS: As far as I understand, I've  12:03:22
16  answered it so --
17       MR. CLARK: Okay. Well, let me move on.
18       MR. GRABOWSKI: Can I make a suggestion?  12:03:26
19  Why don't you walk through just what you did last
20  week to track mark -- mark track dot com --
21       MR. SINGLETON: I say we take a lunch break  12:03:39
22  and come back in 30 minutes.
23       MR. CLARK: Let's do that.
24       THE VIDEOGRAPHER: This marks the end of  12:03:45
25  Volume I, Videotape 1 in the deposition of Ritchie

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 69

1  Phillips. The time is 12:03 p.m. We are off the
2  record.
3       (Luncheon recess taken.)  12:57:17
4       THE VIDEOGRAPHER: This marks the beginning
5  of Volume I, Videotape 2 in the deposition of Ritchie
6  Phillips. The time is 12:58 p.m. We are back on the  12:58:32
7  record.
8     Q.  Good afternoon, Mr. Phillips.
9       Let me go back to one of your answers. We  12:58:38
10  were talking about Exhibit 4. If you could look at
11  your copy of Exhibit 4. It's the schedule of the
12  e-mails at issue in the case. That's the one in your  12:58:55
13  right hand.
14     A.  This one here?
15     Q.  Yes. And you had told me you weren't  12:59:00
16  familiar with the criteria that were used in
17  selecting those e-mails.
18       Do you recall that testimony?  12:59:05
19     A.  Yes.
20     Q.  Did you make your server available to
21  anybody to extract the data that appears on Exhibit  12:59:17
22  4?
23     A.  No. I extracted the information.
24     Q.  Did you extract this specific information  12:59:27
25  on Exhibit 4?

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

18 (Pages 66 to 69)

GROSSMAN & COTTER        (650) 324-1181                    06AUG2806

b5cc5e24-d3ac-4436-aaa4-f02314997231

PHILLIPS   VS.   NETBLUE   RITCHIE PHILLIPS           AUGUST 28, 2006

Page 70

1    A.  Yes.  I can't speak to every line in here
2  but --
3    Q.  So were you given search parameters to      12:59:44
4  define this --
5    A.  No.
6    Q.  -- universe of data?               12:59:49
7    A.  No.
8    Q.  How did you determine what the universe of
9  data would be?                    12:59:54
10    A.  I didn't determine it.
11    Q.  So what was it that you were looking for
12  when you went into the server to extract the     13:00:01
13  information that ended up in Exhibit 4?
14    A.  I have spam filters that extract that
15  information.                    13:00:08
16    Q.  Okay.  So was the data on Exhibit 4
17  extracted by a spam filter?
18    A.  Yes.                     13:00:17
19    Q.  Who is the provider of that spam filter?
20    A.  You want the name of the software?
21    Q.  Yes.  Is it Symantec or --           13:00:29
22    A.  No.  It's a software called x-Wall.
23    Q.  So can you just explain the procedure
24  whereby x-Wall derived -- withdraw that.        13:00:41
25        Are you saying that x-Wall actually

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 71

1  determined the parameters which defined what's set
2  out in Exhibit 4?
3    A.  No, no, this is a printout of selected --   13:00:53
4  I assume selected e-mails.  And I don't know what the
5  criteria was to select these particular e-mails for
6  this particular report?               13:01:03
7    Q.  -- okay.
8    A.  If that's what you're asking.
9    Q.  Yes.  So what was the data that you       13:01:06
10  extracted from your server then?
11    A.  It's data that is extracted by those
12  filters in x-Wall.                  13:01:13
13    Q.  Now, once you extracted the data that was
14  obtained through the filtering mechanism, did you
15  provide that data to somebody else?           13:01:24
16    A.  Yes.
17    Q.  Who did you provide the data to?
18    A.  The Singleton law firm.             13:01:30
19    Q.  Did you provide that data to anybody else
20  other than your attorneys?
21    A.  No.                      13:01:33
22    Q.  Let me go back to the Complaint, which is
23  Exhibit 2, please.  And we were talking about
24  Paragraph 10 at the break.  That's on Page 4,      13:01:48
25  starting at Line 6 -- Line 9, I believe.  And you

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 72

1  recall that I asked you for information about
2  falsified header information and then I asked you
3  about misrepresented header information.        13:02:06
4        Do you recall that?
5    A.  Yes.
6    Q.  Now I'm going to ask you about the third   13:02:10
7  adjective in that Paragraph 10, which is forged
8  header information.
9        And my question is:  Do you have personally 13:02:14
10  any information that any header on any of the 1,500
11  e-mails at issue in this case was forged?
12    A.  Apart from these documents, no.        13:02:26
13    Q.  And you're referring to the same documents
14  that you referred to before the lunch break?
15    A.  I'm referring to the whole of the documents 13:02:34
16  that have been submitted that I've read that have
17  been submitted to me and submitted to you.
18    Q.  Okay.  Would you please go down to the next 13:02:46
19  paragraph on Exhibit 2, which is Paragraph 11.  And
20  I'm going read part of that into the record.  Quote,
21  "Plaintiff alleges that defendants transmitted in   13:02:57
22  excess of 1,500 e-mail advertisements with a subject
23  line that a person would know would be likely to
24  mislead a recipient," and I'm going to end it there. 13:03:09
25        Do you see that language?

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 73

1    A.  Yes.
2    Q.  Do you personally have any information in
3  support of the allegation that the subject line on   13:03:18
4  any of the 1,500 e-mails would be likely to mislead a
5  recipient?
6    A.  Well, my only personal information is the   13:03:27
7  information that's been recorded in these documents.
8  Other than that, I have no personal information.
9    Q.  Okay.  As you sit here today, do you recall 13:03:33
10  any of the personal information that you put into the
11  documents that speaks to whether a subject line was
12  likely to mislead a recipient?            13:03:44
13    A.  Are you asking have I personally traced
14  some of these e-mails or confirmed that this was a
15  proper conclusion that they were deceptive?  Yes.   13:03:56
16    Q.  Okay.  Well, that wasn't exactly what I was
17  asking.  What I was asking is -- what I wanted to ask
18  you is:  Independently of what's in the documents, do 13:04:05
19  you have any knowledge of information that suggests
20  that the subject line was misleading in any of the
21  1,500 e-mails?                    13:04:14
22    A.  Not independent of these documents, no.
23    Q.  Okay.
24    A.  Not that I'm aware of.  I'm not sure I     13:04:19
25  understand the question, but I think I do.

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

GROSSMAN & COTTER      (650) 324-1181                06AUG2806

b5cc5e24-d3ac-4436-aaa4-f02314997231

PHILLIPS   VS.   NETBLUE   RITCHIE PHILLIPS                    AUGUST 28, 2006

Page 74

1    Q.  Okay.  Can you point to any information in
2  any document which supports the allegation that the
3  subject line would be likely to mislead a recipient?  13:04:35
4    A.  Could I point to -- you're asking me to dig
5  out these e-mails and --
6    Q.  Yes.  You've said that the information that  13:04:45
7  supports that allegation is in the documents.
8    A.  Yes.
9    Q.  Now I'm asking you:  What is it in the      13:04:50
10  documents that you believe supports the allegation
11  that the subject line would be likely to mislead a
12  recipient?                          13:04:56
13    A.  Well, once again, this was e-mails that
14  were gathered a year ago.  And as far as the specific
15  ones, I don't carry that information on the top of my  13:05:05
16  head.  So if you're asking me can I remember one of
17  those specific e-mails and any specific violation?
18  No, I couldn't.                      13:05:14
19    Q.  Okay.  Let me ask you to look at Exhibit 7,
20  please, which is the selection of e-mails.
21    A.  Okay.                         13:05:28
22    Q.  What I'd ask you to do is look at the
23  subject line on the first e-mail on Page 1, which
24  reads, "Domino's versus Pizza Hut - Vote now and get  13:05:39
25  a $50 gift card," end of quote.

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 75

1      Do you see that?
2    A.  Yes.
3    Q.  As you sit here today, are you able to      13:05:46
4  provide any information which you believe suggests
5  that that particular subject line is misleading?
6    A.  Not off the top of my head.  Not any more   13:05:56
7  that's probably in these documents already.
8    Q.  Okay.  Would you turn to Page 3 of that
9  Exhibit 7 and look at the subject line, which says,   13:06:06
10  quote, "Cherie, test out this new Razr cell phone and
11  keep it," end of quotes.
12      Do you see that?                  13:06:13
13    A.  Yes.
14    Q.  Is there anything about that particular
15  subject line which you believe to be misleading?      13:06:19
16    A.  It sounds extremely misleading.
17    Q.  Okay.  And why is that, sir?
18    A.  Well, because people are not in the habit   13:06:27
19  of giving free things away.  We just kind of know
20  that by --
21    Q.  Okay.  So you're -- are there any other     13:06:36
22  facts that you have that which suggests to you that
23  there's anything false with regard to that subject
24  line on Page 3 of Exhibit 7?               13:06:46
25    A.  Well, other than having taken this

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 76

1  particular e-mail and doing a follow-up on it, I
2  wouldn't have anything off the top of my head, no.
3    Q.  Okay.  What kind of follow-up would you do  13:06:58
4  to find out if the subject line is false?
5    A.  Well, I think the process that we went
6  through is to just click on the e-mail, see where it  13:07:07
7  takes you.
8    Q.  Did you talk to anybody -- withdraw that.
9      When you say "we clicked on the e-mails and  13:07:23
10  found out where it takes you," who are you talking
11  about?  Who is the "we"?
12    A.  I did that with Richard.  We sat down       13:07:31
13  together.
14    Q.  With your counsel, Mr. Grabowski?
15    A.  Yes.                          13:07:34
16    Q.  Have you ever talked to anybody among the
17  1,500 e-mail recipients who applied for an award and
18  was not -- did not receive that award?          13:07:52
19    A.  Not specific to my knowledge.  We all kind
20  of laugh about the fact that it's a hoax.
21    Q.  Okay.  Apart from your laughing about the   13:07:59
22  fact it's a hoax, have you actually talked to anybody
23  who's told you specifically that it's a hoax?
24    A.  Well, I don't recall whether I have or not.  13:08:12
25  I may have.  I mean, we have these discussions

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 77

1  because it's a constant battle with this stuff.
2    Q.  With regard to that Razr phone subject line
3  on Page 3, did you conclude that it would not -- that  13:08:32
4  a Razr phone would not be awarded to the recipient of
5  this e-mail if he or she had done what was required
6  to earn that award?                    13:08:44
7    A.  Repeat the question.
8    Q.  Sure.  Did you conclude that, if the
9  addressee of this e-mail on Page 3 had done what was  13:08:53
10  required to receive the award, that that award would
11  not be made?
12    A.  Well, I don't know about this specific      13:08:58
13  e-mail.  If you're asking about this specific e-mail,
14  I can't answer that.  I don't know if I traced this
15  specific e-mail or not.                  13:09:07
16    Q.  Okay.
17    A.  Once again, these were a year ago.
18    Q.  Okay.  Let's go back to the Complaint,      13:09:14
19  then, please, which is Exhibit 2.  You can put that
20  exhibit away.
21      Would you please go down to Paragraph 13 on  13:09:30
22  Exhibit 2.  That's on Page 4 at Line 21.  Would you
23  like to read that -- read that to yourself and let me
24  know when you've done so, please.            13:09:48
25    A.  Okay.

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

GROSSMAN  &  COTTER        (650)  324-1181                    06AUG2806

b5cc5e24-d3ac-4436-aaa4-f02314997231

PHILLIPS   VS.   NETBLUE   RITCHIE   PHILLIPS                    AUGUST 28, 2006

Page 78

1    Q.  Now, what I want you to focus on, please,
2  is the allegation that defendants initiated the
3  transmission to a protected computer in excess of     13:10:26
4  1,500 commercial e-mail electronic messages that did
5  not contain a functioning return electronic mail
6  address.                              13:10:33
7       Do you see that?
8    A.  Yes.
9    Q.  Did you test any of the 1,500 e-mail      13:10:36
10 messages to determine whether the return electronic
11 mail address was functioning?
12   A.  Once again, I don't know if I did      13:10:46
13 specifically any one of those particular 1,500
14 e-mails.  I have a lot of experience trying to trace
15 those by the return addresses, spams that come in.    13:10:56
16 So that was a year ago.  Whether I did one of those
17 1,500 specifically, I don't recall.
18   Q.  Okay.  Did you make any notes of any      13:11:02
19 investigation that you made with regard to whether
20 were there -- any e-mails had a functioning return
21 e-mail address?                         13:11:09
22   A.  No.
23   Q.  Would you please go to Paragraph 14 on the
24 same document.  It starts at the bottom of Page 4 and  13:11:29
25 goes on to the next page.  And I'd like you to focus,

Page 79

1  please, on the part of that paragraph which is on
2  Page 5 that refers to a valid physical postal
3  address.                              13:11:44
4       Do you see that at the end of the
5  paragraph?
6    A.  Um-hum.                          13:11:47
7    Q.  And you will notice that the paragraph
8  starts off with an allegation that 1,500 e-mails were
9  sent which were deficient in certain ways.  One of     13:11:59
10 them was that there was no valid physical postal
11 address.
12      Do you see that?                    13:12:03
13   A.  Yes.
14   Q.  Did you personally do any check to
15 determine whether the addresses reflected on any of    13:12:09
16 the 1,500 e-mails were valid addresses?
17   A.  I never followed up any valid postal
18 addresses, no.                          13:12:15
19   Q.  Do you know if anybody else did?
20   A.  I believe Richard did.
21   Q.  With respect to the 1,500 e-mails?       13:12:22
22   A.  I believe he did.  And actually, I have
23 traced some of those -- tried to trace some of those
24 to find out their -- I traced some of them into Las    13:12:36
25 Vegas.  And I can't remember whether they were

Page 80

1  specific to those e-mails or some other e-mails.
2    Q.  Okay.  The activity that you took in
3  tracing some of the addresses, how did you go about    13:12:48
4  doing that?
5    A.  Usually a Whois off of the IP address
6  that's in the header, where its last relay was.  It    13:12:58
7  will have an IP address, and you can Whois that IP
8  address.  If it's valid or it exists or if you can
9  find out who it belongs to, then you can -- usually    13:13:07
10 the Network Solutions or whoever is holding their DNS
11 will have a phone number or an address, of which I
12 have called those phone numbers trying to get people   13:13:22
13 to stop sending that junk to our e-mail server.
14   Q.  Now, did you contact the address on the
15 Whois or other search, or did you contact the address  13:13:33
16 shown on the e-mail?
17   A.  You take the IP address in the e-mail and
18 you can run a Whois on it, and it will tell you who     13:13:41
19 that particular IP address is registered to, along
20 with its technical contact and its administrative
21 contacts and phone numbers.  And you can call those    13:13:50
22 numbers and ask for the IP department and try to
23 report that either their e-mail server is being used
24 as a relay or a spoof or to see if you can get them    13:14:03
25 -- I don't do that anymore because you can never get

Page 81

1  anywhere doing that.  But I have done -- in times
2  past, I did quite a bit of that.
3    Q.  Okay.  And the calls that you made were to  13:14:13
4  the addresses and phone numbers obtained by the Whois
5  or other search; is that correct?
6    A.  Usually.                          13:14:18
7    Q.  Now, look at Exhibit 7, if you would once
8  again.  It's on the top of that pile.  If you turn to
9  the second page, you will notice an address of Mail    13:14:38
10 Gravity, Inc., 545 Eighth Avenue.
11      Do you see that?
12   A.  Yes.                             13:14:41
13   Q.  Did you ever contact any of the addresses
14 that appear on any of the 1,500 e-mails at issue in
15 the case?                              13:14:53
16   A.  I don't know.  Once again, that was a year
17 ago and there's 1,500 of them.  And I contacted some
18 of them.  This was not familiar off the top of my      13:15:01
19 head, so I probably didn't this one.  But I don't
20 know if there's any within those 1,500 specifically
21 that I actually did that to.                13:15:10
22   Q.  Well, the distinction I want to draw is I
23 understand that you called some people whose
24 addresses you came from a Whois or other kind of       13:15:18
25 search.

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

GROSSMAN & COTTER          (650) 324-1181                      06AUG2806

b5cc5e24-d3ac-4436-aaa4-f02314997231

PHILLIPS   VS.   NETBLUE   RITCHIE PHILLIPS                 AUGUST 28, 2006

Page 82

```
 1      A.  Correct.
 2      Q.  What I want to know is whether you also, in
 3   addition to that, you called the number on the      13:15:22
 4   e-mails.
 5      A.  Yes.
 6      Q.  Okay.  But you can't recall whether or not  13:15:27
 7   it was the 1,500 e-mails, one of those?
 8      A.  Yeah.  I don't know specifically or not.
 9      Q.  Let me turn that into a proper question.      13:15:32
10        Is it your testimony that you don't recall
11   whether your inquiries of addresses on e-mails
12   related to the 1,500 e-mails at issue in the case?   13:15:45
13      A.  Specifically, no.
14      Q.  Still on Exhibit 2, please, if you can look
15   at the Complaint once again and go back to Page 5.  I  13:15:58
16   would like you to look, please, at Paragraph 15,
17   which starts at Line 4 on Page 5.  And the allegation
18   reads, quote, "Plaintiff alleges that defendants used  13:16:09
19   a harvest and directory attack or used an automated
20   creation of multiple e-mail accounts to send in
21   excess of 1,500 commercial electronic mail message to  13:16:22
22   a protected computer."  End of quotes.
23        Do you see the sentence?
24      A.  Yes.                          13:16:26
25      Q.  Do you have any information that any of the
```

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 83

```
 1   defendants used a harvest or directory attack?
 2      A.  I think there was one that was outlined in
 3   one of the responses that had to do with a header   13:16:45
 4   that was off of two different domains with the same
 5   generated e-mail recipient in those two domains.  And
 6   they were real cryptic, you know, 20 letter generated  13:16:59
 7   -- obviously computer-generated names attached to
 8   entirely different domains.
 9        So if that answers your question.          13:17:07
10      Q.  Okay.  So --
11      A.  So that's one instance of why it was clear
12   to us.                             13:17:14
13      Q.  Okay.  What is your understanding of what a
14   harvest or directory attack is?
15      A.  Well, there's probably several ways to do  13:17:26
16   it.  People break into people's server and try to get
17   all the e-mail addresses off of the server.  They do
18   dictionary addresses, where they'll start with As and  13:17:39
19   send A to a domain and AB to a domain and ABC to a
20   domain all the way through the dictionary.  With
21   computers it's very easy to do that.  All you got to  13:17:50
22   do is get a connection and start flooding it.
23        There's some of the e-mails we've gotten
24   that the e-mail addresses doesn't even exist.      13:18:03
25      Q.  Okay.  I appreciate --
```

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 84

```
 1      A.  That leads us to those conclusions.
 2      Q.  I appreciate that you've explained how you
 3   believe this was accomplished, but I want to get back  13:18:11
 4   to the definitional term, just to make sure you and I
 5   understand what we're talking about.  And I want to
 6   find out what you mean by the term "harvest."  Let's  13:18:18
 7   start with the harvest.
 8        What do you mean by the term "harvest"?
 9      A.  Well, you know, that -- I'm not sure that's  13:18:32
10   entirely a good term but I'm not sure it's bad.
11   They're collecting e-mail addresses either through
12   breaking into an e-mail server or -- which I assume   13:18:47
13   would be probably the most common way to do it.
14      Q.  Okay.  Now, do you have any evidence that
15   any of the defendants broke into an e-mail server to  13:18:54
16   obtain e-mail addresses?
17      A.  We have e-mail addresses that don't exist,
18   and so they couldn't exist any other way.  Oh, as far  13:19:02
19   as harvest?
20      Q.  Yes.
21      A.  No.  I don't personally know.          13:19:08
22      Q.  Do you have any information that any of the
23   defendants made -- participated in a directory attack
24   in order to obtain e-mail addresses?          13:19:18
25      A.  I don't have any personal information, no.
```

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 85

```
 1   Other than what's in these -- the strategy laid out
 2   in these papers, I don't know.
 3      Q.  Okay.  And do you have any information that  13:19:25
 4   any defendant used an automated creation of multiple
 5   e-mail accounts to send the 1,500 e-mails at issue in
 6   this case?                          13:19:35
 7      A.  Once again, I'd have to review all of those
 8   e-mail addresses and see if they all existed.  But
 9   there has been -- we typically get e-mail addresses   13:19:43
10   that don't exist.  And so they have to be generated
11   by somebody.  They weren't generated by us.
12      Q.  Okay.  Is it your testimony that it's      13:19:54
13   possible to harvest an e-mail account that doesn't
14   exist?
15      A.  Well, no.  We're talking about two       13:20:04
16   different issues.  If you're harvesting something --
17   I assume that term -- you're harvesting something
18   that exists.  Somebody broke into the server and     13:20:13
19   steals the list of e-mail accounts out of your radius
20   server.  I have a radius server, and it has
21   everybody's -- I have a mail server that has       13:20:23
22   everybody's account in it.  And people can break into
23   that, and have broke into it.  It's been a long time,
24   but people break into it and they can get a list of   13:20:32
25   everybody that's in there.
```

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

22 (Pages 82 to 85)

GROSSMAN & COTTER        (650) 324-1181                06AUG2806

b5cc5e24-d3ac-4436-aaa4-f02314997231

PHILLIPS   VS.   NETBLUE   RITCHIE PHILLIPS          AUGUST 28, 2006

Page 86

1    Q.  Okay.  Let me go and change the focus back
2  to the automated creation.
3       So you believe that, because e-mail was    13:20:46
4  sent to non-existing e-mail addresses, that that
5  indicates that there was an automatic creation of
6  multiple accounts?                              13:20:54
7    A.  Yeah, which is a common practice.
8    Q.  Now, do you --
9    A.  It exists all over the world.  It's common. 13:20:59
10    Q.  Okay.  Now, do you have any information
11  that suggests that NetBlue engaged in that practice
12  with respect to the 1,500 e-mails?             13:21:13
13    A.  Other than what's stated in these
14  documents, I have no personal knowledge, no.
15    Q.  When you referring to something stated in  13:21:21
16  the documents, what are you referring to?
17    A.  Well, there's the documents that have been
18  submitted to you and the court and which have been  13:21:28
19  given to me a copy of all of them, which I've read
20  through.
21    Q.  Okay.  But what is in those documents that  13:21:34
22  addresses the issue of automatic creation of multiple
23  e-mail accounts by NetBlue, according to your
24  information?                                   13:21:40
25    A.  Well, I'd have to review those documents

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 87

1  again.  I can't tell you that off the top of my head.
2    Q.  Okay.  So as you sit here now, you don't
3  have any information other than what you've testified 13:21:49
4  about?
5    A.  No.  We've submitted to you all the
6  information that we have.  And so I don't have any  13:21:55
7  additional information.
8    Q.  Okay.  Still on Exhibit 2, please, would
9  you go down to Paragraph 18 starting at Line 17.  You 13:22:10
10  will notice that that paragraph refers to a header
11  information that was alleged to be materially false
12  or materially misleading.                      13:22:18
13       Do you see that?
14    A.  Yes.
15    Q.  And there's a reference to "No charge.     13:22:26
16  "you pay nothing."  "Market survey group," et cetera.
17       Do you see that?
18    A.  Yes.                                      13:22:31
19    Q.  And then it goes on to say, quote, "These
20  false e-mails name resolved into e-mails sent by
21  various persons or persons unknown." End of quotes.  13:22:43
22       Do you see that?
23    A.  Yes.
24    Q.  Do you have information that indicates --   13:22:48
25  that supports that allegation that the e-mail names

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 88

1  resolved into e-mails sent by various persons or
2  persons unknown?
3    A.  Well, there's some laid out once again in   13:23:03
4  these documents that -- but in general, it's often
5  very difficult to find where e-mails come from.
6  They're so hidden.  And there's various relays and  13:23:16
7  it's very difficult to find out where that stuff
8  comes from.
9    Q.  Okay.  So is it your understanding that     13:23:22
10  that sentence is referring to origin of e-mails,
11  e-mail senders being obscured in some way?
12    A.  Yes.                                       13:23:27
13    Q.  Now, the next sentence refers to a random
14  check.  It reads as follows, quote, "A random check
15  of these e-mail senders indicated that the source    13:23:41
16  changed" on daily -- I beg your pardon -- "that the
17  source changed on a daily basis to a different and
18  new unknown source." End of quotes.            13:23:50
19       Do you see that?
20    A.  Yes.
21    Q.  Now, first of all, do you know who made the 13:23:54
22  random check that's referred to there?
23    A.  Well, I've made these random checks before.
24  And whether it's specific to these 1,500 e-mails,    13:24:04
25  once again, these are a year ago so I don't know.

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 89

1  But I know Richard has also.
2    Q.  Do you know what is meant by the statement
3  that the source changed on a daily basis to a      13:24:14
4  different and new unknown source?
5    A.  They moved servers.  They moved servers.
6  We have -- part of the spam filters are what we call 13:24:21
7  a "black hole list."  And when there's spam coming
8  out of a common IP address that gets reported, it
9  will get black listed on some of the black hole lists 13:24:32
10  in the country.  There's several of them.  And that
11  will cut off that e-mail for a while.  And as soon as
12  they figure out they're black holed, they will move  13:24:40
13  to another IP address and start doing the same thing
14  again until it catches up with them.
15       So there's a constant moving of those      13:24:44
16  people because it's illegal do to this.  That's why
17  there's codes against it.  It's illegal.
18    Q.  So are you saying that somebody is using    13:24:51
19  the same sender's e-mail address off multiple
20  servers?
21    A.  At different times, sure.                  13:25:00
22    Q.  And that's what the allegation is here
23  about the source being changed on a daily basis?  Is
24  that what you mean?                            13:25:09
25    A.  The server that it comes out of.

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

GROSSMAN & COTTER        (650) 324-1181                06AUG2806

b5cc5e24-d3ac-4436-aaa4-f02314997231

PHILLIPS   VS.   NETBLUE   RITCHIE PHILLIPS            AUGUST 28, 2006

Page 90

1     Q.  Now, did you do a random check with respect
2   to any of the 1,500 e-mails at issue in this case?
3     A.  Once again, those were a year ago.  And    13:25:17
4   whether I did random checks specifically on those
5   1,500 e-mails, I don't remember.  I have done checks
6   on several spams trying to catch them and block them  13:25:30
7   out, but they're tough to catch because they move all
8   the time.
9     Q.  Okay.  Now, do you have any documents which  13:25:37
10  would refresh your recollection with regard to
11  whether or not you conducted random checks with
12  respect to the 1,500 e-mails in this case?     13:25:44
13    A.  Do I have any documents?
14    Q.  Yes.
15    A.  No.                          13:25:46
16    Q.  Would you please turn over the page to
17  Paragraph 21 of Exhibit 2.  And that paragraph refers
18  to three separate items of electronic mail from the   13:26:07
19  defendants to an e-mail address that had not existed
20  for the prior year.
21       Do you see that?                13:26:12
22    A.  Yes.
23    Q.  What are those e-mail addresses?
24    A.  I don't know them off the top of my head.   13:26:18
25  There's several of them.

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 91

1     Q.  There's a reference here to three of them.
2       Do you know any of the three as you sit
3   here today?                         13:26:25
4     A.  Not off the top of my head, no.
5     Q.  What would you have to look at to determine
6   what those three addresses were or are?     13:26:32
7     A.  I don't know if they're listed here
8   anywhere or not.
9     Q.  So do you have any document that you can   13:26:43
10  refer to that would give us the names of those three
11  e-mail addresses?
12    A.  I can ask Richard.              13:26:52
13       These three.  He's asking about these three
14  that were sent to either addresses that hadn't been
15  active for a year or didn't exist at all.     13:27:03
16    Q.  Do you have any idea?  I'm not taking
17  Mr. Grabowski's deposition.
18       MR. GRABOWSKI:  You gave him the list.   13:27:13
19       THE WITNESS:  I mean, I don't know those
20  three off the top of my head.  Once again, this is an
21  ongoing problem that goes on every day.  And every   13:27:21
22  day we get e-mails that are sent to non-existent or
23  -- so what has happened is they made a law against
24  people doing that.  And I'm very aware of the law and  13:27:33
25  very aware of people doing that.

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 92

1       Whether NetBlue did that or not is
2   something we're going to argue in court evidently.
3   BY MR. CLARK:                       13:27:39
4     Q.  That's what I'm trying to determine.
5       As you sit here today, you can't tell me,
6   can you, sir, that those three e-mails came from   13:27:45
7   NetBlue or any of the defendants?
8     A.  Well, I think we have documents that -- we
9   do.  Other than what's in these documents, no, I   13:27:55
10  can't I can't tell you anything.  I mean, I run a
11  business all day, every day.  I don't just sit around
12  and think about this.                  13:28:06
13    Q.  I understand.  I just want to find out what
14  you know and what you don't know.  And once I
15  determine that, I'll move on.  Let me ask you to go   13:28:13
16  to Paragraph 24, please, on Exhibit 2, still on the
17  Complaint.  And that refers to statutory damages.
18       Do you see that?                13:28:21
19    A.  Yes.
20    Q.  Now, did R&D Computers suffer any --
21  withdraw that.                      13:28:29
22       Do you believe that R&D Computers suffered
23  any actual damages relating to the 1,500 e-mails at
24  issue in this case?                  13:28:37
25       MR. SINGLETON:  I'll object and I'll

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 93

1   instruct the witness not to answer.
2       You may either seek statutory damages under
3   the Can-Spam Act or you may seek actual damages.    13:28:45
4   Actual damages are not pled in the Complaint, only
5   statutory damages.  Consequently, it's not relevant
6   to the subject matter of the action.       13:28:51
7       MR. CLARK:  It is relevant, Counsel.  It's
8   relevant to adverse effect.  So would you please
9   allow --                          13:28:55
10      MR. SINGLETON:  Well, adverse effect is not
11  pled in the Complaint.  And if you can show me where
12  it is, we can talk about it.  We've only pled    13:29:01
13  statutory damages.
14      MR. CLARK:  Okay.  Do you want to stipulate
15  he didn't suffer adverse effect?         13:29:05
16      MR. SINGLETON:  Why don't we take this off
17  the record.
18      MR. CLARK:  Okay.                13:29:08
19      THE VIDEOGRAPHER:  We are off the record.
20  The time is 1:29.
21       (Discussion off the record.)        13:32:10
22      THE VIDEOGRAPHER:  We are back on the
23  record.  The time is 1:32.
24      MR. CLARK:  Madam Court Reporter, would you  13:32:25
25  mind reading back the last question, please.

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

GROSSMAN & COTTER        (650) 324-1181                06AUG2806

b5cc5e24-d3ac-4436-aaa4-f02314997231

PHILLIPS   VS.   NETBLUE   RITCHIE PHILLIPS                AUGUST 28, 2006

Page 94

1     (Record read.)
2        MR. SINGLETON:  Again, do you want to
3  rephrase the question as to adverse effect as opposed  13:32:50
4  to damages?
5        MR. CLARK:  No.  I'll stand on the
6  question.                        13:32:58
7        MR. GRABOWSKI:  Then we have to object on
8  the basis it calls for a legal conclusion.  Actual
9  damages is a legal term.  Either define it or ask him  13:33:07
10  a way he can answer it.
11        MR. CLARK:  Okay.  I'll put another
12  question.                        13:33:15
13  BY MR. CLARK:
14     Q.  Did R&D Computers incur any additional
15  expenditure as a result of these 1,500 e-mails having  13:33:25
16  been sent to its server?
17        With all due respect, you can look at your
18  counsel as long as you like, but it's your question.  13:33:43
19        MR. SINGLETON:  I want you to answer the
20  question.
21        THE WITNESS:  So as specific to these 1,500  13:33:48
22  e-mails, you're asking me if it's caused me -- repeat
23  the question.
24  BY MR. CLARK:                    13:33:53
25     Q.  Okay.  Did R&D Computers incur any

Page 95

1  additional expense arising from the fact that these
2  1,500 computers -- the 1,500 -- withdraw that.
3        Did R&D Computers incur any additional  13:34:14
4  expense because of the fact that these 1,500 e-mails
5  were sent to its server?
6     A.  In addition to what?        13:34:22
7     Q.  Any expenses that were unusual or would not
8  have been incurred but for the 1,500 e-mails?
9     A.  No.                        13:34:35
10     Q.  Did R&D Computers --
11        MR. GRABOWSKI:  Hold on for a second.
12        THE WITNESS:  Pardon me?        13:34:47
13        MR. GRABOWSKI:  Can we break again?
14        MR. CLARK:  Okay.
15        THE VIDEOGRAPHER:  We are off the record.  13:34:52
16  The time is 1:34.
17        (Discussion off the record.)
18        THE VIDEOGRAPHER:  We are back on the  13:36:43
19  record.  The time is 1:36.
20  BY MR. CLARK:
21     Q.  Did you -- withdraw that.        13:36:52
22        Did R&D Computers have to purchase any
23  additional hardware as a result of the fact that
24  1,500 e-mails that are at issue in this case were  13:37:03
25  sent to your server?

Page 96

1     A.  Well, yes.
2     Q.  What additional hardware was required to be
3  purchased because of the 1,500 e-mails that were sent  13:37:19
4  to the server?
5     A.  In order to combat this e-mail, these
6  e-mails and e-mails like them, we spent a lot of  13:37:27
7  time.  We spent a lot of time with customers trying
8  to run down false positives.  We spent a lot of time
9  with e-mail filters, keeping them updated.  We deal  13:37:37
10  with complaints all day long for the trash that ends
11  up in people's e-mail boxes so that they can't even
12  read valid e-mails.  We spend a lot of time and  13:37:47
13  energy trying to keep this stuff out of our
14  customers' e-mail.  And so this -- these 1,500
15  e-mails that -- are all part of that effort.        13:38:02
16     Q.  Okay.  You say you spent time with
17  customers.
18        Which of the customers who received the  13:38:11
19  1,500 e-mails did you spend time with of the kind
20  that you just described?
21     A.  Once again, those were a year ago and I  13:38:24
22  wouldn't be able to recollect that.
23     Q.  Okay.  Are you able to recollect whether
24  you spoke to any of the customers who received one of  13:38:31
25  the 1,500 e-mails?

Page 97

1     A.  No, I don't recollect.
2     Q.  Do you have a belief whether or not you
3  actually talked to any of the 1,500 -- withdraw that.  13:38:43
4        Do you have a belief with regard to whether
5  or not you actually talked to any of the customers
6  who received any of the 1,500 e-mails?        13:38:51
7     A.  I believe I did.  I talked to customers on
8  a consistent basis about the problem with spam.  It
9  is tremendous.  It -- without our e-mail filters, it  13:39:02
10  would render e-mail unusable.
11     Q.  Okay.
12     A.  And so we have a lot of conversations on an  13:39:08
13  ongoing basis about the problems of these kinds of
14  e-mails.
15     Q.  Mr. Phillips, what I'm trying to do is I'm  13:39:15
16  trying to talk about the 1,500 e-mails.  I understand
17  that you're answering the questions more broadly, but
18  I want to know what you can tell me about the 1,500  13:39:24
19  e-mails in this case and the people who received
20  those e-mails.
21     A.  Yeah.  Those are a year ago, and I don't  13:39:31
22  recollect specific conversations.  These
23  conversations go on every day.
24     Q.  Okay.  And what I'm trying to determine in  13:39:38
25  addition to that is:  Do you have a belief that you

b5cc5e24-d3ac-4436-aaa4-f02314997231

PHILLIPS   VS.   NETBLUE   RITCHIE PHILLIPS                    AUGUST 28, 2006

Page 98

1  spoke to any of the addressees of the 1,500 e-mails?
2      A.  I spoke to most of my clients off and on
3  over the years about many of the things, including    13:39:52
4  the problems of spam.  We're all very aware of it.
5      Q.  Okay.  Does that mean that you're unable to
6  provide me with any information with regard to any    13:40:03
7  addressee of any of the 1,500 e-mails?
8      A.  I'm unable to provide you with a specific
9  conversation to a specific person.                13:40:13
10     Q.  Did R&D Computing have to purchase any
11 additional software as a result of the 1,500 e-mails
12 at issue in this case having been sent to its server?  13:40:36
13     A.  Once again, R&D has spent considerable time
14 and energy on the issue of spam, of which these 1,500
15 are a part of, including servers and software and    13:40:48
16 updates and dealing with disgruntled clients and
17 angry clients and lost e-mails.  And there's a lot of
18 time consumed to deal with this issue, of which these  13:40:58
19 are a part of.
20     Q.  Let me ask you, please, to answer the
21 question, which is:  Was R&D Computing required to    13:41:06
22 acquire any additional software because of the 1,500
23 e-mails sent to its server?
24     MR. SINGLETON:  Asked and answered.         13:41:11
25     You may answer.
Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 99

1      THE WITNESS:  Yes.
2  BY MR. CLARK:
3      Q.  What additional software --           13:41:17
4      A.  We have --
5      Q.  Let me just ask the question.
6      What additional software did R&D Computers  13:41:21
7  acquire in order to address the fact that these 1,500
8  e-mails had been sent to it?
9      A.  x-Wall.  That's our filter software.     13:41:31
10     Q.  Okay.  So did you -- are you saying that
11 R&D Computing had to purchase additional x-Wall
12 software?                                13:41:38
13     A.  No.  I'm saying that I had to -- I had to
14 purchase x-Wall software as a filter to block out
15 these 1,500 as well as many others.           13:41:49
16     Q.  Okay.  When did you purchase x-Wall?
17     A.  Well, I got to guess.  Probably -- I want
18 to say five years.  I'm not sure that's real     13:42:04
19 accurate, but that will do.
20     Q.  And --
21     A.  I have to look that up specifically.     13:42:10
22     Q.  Do you use x-Wall on a renewable contract?
23     A.  I get constant updates from them.
24     Q.  And do you pay for those updates?        13:42:19
25     A.  No.  It came with the purchase price.
Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 100

1      Q.  So the --
2      A.  It was part of the purchase price.
3      Q.  So when you initially purchased the x-Wall,  13:42:27
4  it came with updates for indefinitely?
5      A.  Yeah.  As a part of the purchase price.
6      Q.  Did you acquire any other software --    13:42:48
7  filtering software apart from x-Wall at any time?
8      A.  I've tried various.  We run tests on
9  different software based on their effectiveness at    13:43:01
10 various times.  I have stuck with x-Wall over the
11 years because it has proved to be a fairly reliable
12 product.                                13:43:08
13     Q.  Okay.  Was there any other software that
14 you either acquired or upgraded in order to address
15 any problems arising from the 1,500 e-mails?     13:43:17
16     A.  No.  No.
17     Q.  Did R&D Computing have to increase the
18 bandwidth of its server as a result of receiving the  13:43:52
19 1,500 e-mails?
20     A.  R&D Computers has increased the bandwidth
21 of their servers over the years, partly because of   13:43:59
22 the impact of these 1,500 e-mails as well as many
23 others that we get.  It clogs up the whole system.
24     Q.  When was the last time that bandwidth was  13:44:09
25 increased?
Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 101

1      A.  Oh, probably four years ago.  Four or five
2  years ago.
3      Q.  Do you have any documents that relate to   13:44:18
4  that increase in bandwidth, for example, the invoices
5  for hardware or software?
6      A.  I have a contractual agreement with SBC.   13:44:29
7      Q.  And did you make arrangements with SBC to
8  increase the bandwidth available to your server?
9      A.  I have periodically over the years.       13:44:40
10     Q.  The last one was four or five years ago,
11 was it?
12     A.  Yes.                              13:44:43
13     Q.  When was the last time that you increased
14 the server capacity?
15     A.  Well, I just upgraded the filter in the    13:44:59
16 last three weeks, three or four weeks.
17     Q.  Have you increased the capacity of the mail
18 server within the last twelve months?           13:45:10
19     A.  Not in the last twelve months.  Did that
20 about two years ago.
21     Q.  Within the last twelve months, have your   13:45:27
22 server charges increased in any way?
23     A.  In the last twelve months?
24     Q.  Yes.                             13:45:33
25     A.  Just the replacement of the filter.
Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

GROSSMAN & COTTER       (650) 324-1181                    06AUG2806

b5cc5e24-d3ac-4436-aaa4-f02314997231

PHILLIPS   VS.   NETBLUE   RITCHIE PHILLIPS                    AUGUST 28, 2006

Page 102

1    Q.  Apart from the replacement of the filter,
2  have there been any increases in server charges in
3  the last twelve months?                    13:45:43
4    A.  Well, are you asking about actual cash
5  flows going out?
6    Q.  Yes.                              13:45:47
7    A.  No.
8    Q.  Now --
9    A.  Maybe affecting cash flows coming in, but  13:45:54
10  not cash flows going out.
11    Q.  When you say affecting cash flows coming
12  in, what do you mean by that?               13:45:59
13    A.  We have people that are frustrated with all
14  the spam they get every day, and sometimes it's tough
15  to deal with customers that are frustrated and  13:46:07
16  yelling over the phone and -- because they either
17  didn't get their e-mail or they get so much junk they
18  can't read their own e-mail.               13:46:14
19    Q.  How does that --
20    A.  It adversely affects my business.  It
21  particularly adversely affects my state of mind.  13:46:20
22    Q.  Okay.  How does it affect your income
23  stream coming in?
24    A.  Well, when there are disgruntled customers,  13:46:27
25  they go believing that somehow I'm supposed to be
          Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 103

1  able to stop these guys from doing this stuff.
2  They'll go to somebody else thinking that somehow I'm
3  not being tight enough on my filters or, you know, we  13:46:40
4  get complaints in all directions.
5        Either we tighten it down so much that
6  there's too many false positives and people complain.  13:46:47
7  And we loosen it up and they get too much junk.  It's
8  a constant battle to keep that balance.  And we fail
9  at that balance sometimes.  We get disgruntled  13:46:54
10  customers.  The whole thing is an aggravation.
11    Q.  Did you lose any e-mail customers because
12  of the 1,500 e-mails at issue in this case?  13:47:02
13    A.  I'm sure we did as a part -- as a part of
14  spam problems including -- which include these 1,500
15  e-mails.                               13:47:09
16    Q.  Can you give me the name of any customer
17  you lost as a result of the 1,500 e-mails?
18    A.  I don't think I can pass out customer  13:47:18
19  names.
20    Q.  Well, do you know of any customer who you
21  lost as a result of the 1,500 e-mails being sent to  13:47:23
22  your server?
23    A.  I don't keep track of that specifically,
24  no.  Just let them go.                   13:47:27
25    Q.  So the answer is you don't know of any
          Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 104

1  specific customer that you lost?
2    A.  I can't give you the name of a specific
3  customer.  I wouldn't anyway, but I don't have any  13:47:34
4  off the top of my head.  I mean, I deal with about
5  2,000 customers every day.
6    Q.  You mean you actually talk to 2,000  13:47:45
7  customers a day?
8    A.  No.  But I deal with their equipment, their
9  mail, their networks, their -- so I don't remember  13:47:52
10  every conversation with every person over every
11  detail, particularly a year ago.
12    Q.  Did the 1,500 e-mails at issue in this case  13:48:01
13  create any disruption of services to your e-mail
14  customers?
15    A.  I couldn't address that specifically.  I  13:48:08
16  don't know.  I'd have to ask them.
17    Q.  And so what would you ask them to answer
18  that question?  Would you ask them if their personal  13:48:17
19  e-mail was disrupted in any way?
20    A.  Well, I probably wouldn't ask them, because
21  number one, they wouldn't be able to answer me over  13:48:24
22  an issue a year ago.  I know that their response
23  would be that they hate spam and they wish I would do
24  a better job at filtering it.            13:48:33
25    Q.  Did any customer say to you that any of the
          Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 105

1  1,500 e-mails caused some disruption in the
2  customers' e-mail service?
3    A.  I've gotten lots of complaints about people  13:48:52
4  being unable to get to specific e-mails because of
5  the flood of junk that comes into theirs.  And I
6  don't recall specifically whether those 1,500 e-mails  13:49:02
7  were a part of any particular complaint or not.
8    Q.  I want to go back to the question that
9  caused the most recent going off the record, just to  13:49:24
10  make sure that I got your answer there.
11        Was it your testimony that you can't think
12  of any actual expense that was incurred by R&D  13:49:34
13  Computers resulting from the sending of the 1,500
14  e-mails to your server?
15    A.  No.  I think I -- I think we amended that  13:49:40
16  answer when we came back in.
17    Q.  So do you know, sir, that you did incur
18  expense?                              13:49:45
19    A.  Well, those 1,500 are part of the expenses
20  that I pay to battle particular problem on a daily
21  basis, and those 1,500 were a part of it.  13:49:55
22    Q.  Okay.  And what is the -- what are the
23  expenses that you incur to battle this problem on a
24  daily basis?                          13:50:00
25    A.  Well, besides the financial expense of the
          Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

GROSSMAN & COTTER        (650) 324-1181                    06AUG2806

b5cc5e24-d3ac-4436-aaa4-f02314997231

PHILLIPS   VS.   NETBLUE   RITCHIE PHILLIPS            AUGUST 28, 2006

Page 106

1  x-Wall filters and the machine to run it and the
2  bandwidth it uses and the lost customer base as of --
3  because of the frustration of not being able to block  13:50:10
4  that stuff out -- I got lost here.
5     Q.  Okay.  Is there any other loss, either
6  financial or emotional or in the sense of lost      13:50:25
7  profits, that you haven't described in this
8  deposition today that you can you can think of?
9     A.  I don't think I've probably adequately     13:50:32
10 described the frustration of dealing with this whole
11 issue on a daily basis, but I've tried.  So I don't
12 know whether I've adequately done that or not.     13:50:43
13    Q.  Okay.  What I want to know is if you've
14 told me everything you know about additional expenses
15 that were incurred, in whole or in part, because of  13:50:53
16 the 1,500 e-mails?
17    A.  I think so, at that point in time anyway.
18 That's all I can think of.                 13:51:00
19    Q.  Did the receipt of any of the 1,500 e-mails
20 result in a server crash?
21    A.  I don't know that specifically, whether it  13:51:20
22 did or didn't.
23    Q.  You don't recall whether your server
24 crashed sometime between August and October 2005?  13:51:27
25    A.  I don't recall specifically, no.
                Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 107

1     Q.  Do you know -- do you think -- okay.
2     A.  I mean, spam causes a lot of problems.  And
3  whether it causes a specific problem during that    13:51:38
4  specific time over that specific e-mail, I couldn't
5  address.
6     Q.  My question is very narrow.  It's in the    13:51:44
7  period August through October 2005 --
8     A.  Yes.
9     Q.  -- did you have a server crash?       13:51:48
10    A.  I don't remember.
11    MR. CLARK:  Okay.  Let me have marked as
12 Exhibit 8 Plaintiff's Responses to Defendants'    13:52:36
13 Interrogatories.
14    (Whereupon, Defendants' Exhibit 8 was
15 marked for identification.)            13:52:57
16 BY MR. CLARK:
17    Q.  Mr. Phillips, would you please look at the
18 second to the last page of Exhibit 8 and tell me if  13:53:18
19 that's your signature on the verification.
20    A.  That's me.
21    Q.  So does that refresh your recollection that  13:53:24
22 you've seen this document before?
23    A.  Yes.
24    Q.  Would you please go to the response to   13:53:32
25 Interrogatory Number 16, which is -- the pages are
                Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 108

1  not numbered, but it's the third page of the
2  document.
3     MR. CLARK:  We just have a message that the  13:53:50
4  judge is available.  So let's take a break.
5     THE VIDEOGRAPHER:  We are off the record.
6  The time is 1:53.              13:53:56
7     (Recess taken.)
8     THE VIDEOGRAPHER:  We are back on the
9  record.  The time 2:08.           14:08:41
10    MR. CLARK:  Thank you.
11 BY MR. CLARK:
12    Q.  Mr. Phillips, do you have Exhibit 8 in    14:08:46
13 front of you, which is the interrogatory response?
14    A.  Yes.
15    Q.  What I would like you to look at on page --  14:08:54
16 it's the unnumbered page which is the third page of
17 the document.  And you will see it starts off at the
18 end of the second line with "Plaintiff has incurred   14:09:03
19 monetary losses."
20    Do you see that.  Have you got that in
21 front of you?                 14:09:09
22    MR. SINGLETON:  Which page and which line
23 number?
24    MR. CLARK:  It's the un- -- it's the third  14:09:12
25 page in the document that doesn't have a page number
                Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 109

1  on it.
2     MR. SINGLETON:  What line?
3     MR. CLARK:  Line 18, starting at the end.   14:09:20
4  "Plaintiff has incurred monetary losses."
5  BY MR. CLARK:
6     Q.  Do you see that?  My question is:  Have you  14:10:15
7  had that paragraph in front of you?
8     A.  Yes.
9     Q.  Okay.  The first part of that on the second  14:10:23
10 sentence read, "Plaintiff has incurred monetary
11 losses in the form of the purchase of spam filtering
12 software."                    14:10:27
13    Do you see that?  Line 20?
14    A.  Oh.  Down -- okay.  The response, yes.
15    Q.  Now, is that a reference to the x-Wall     14:10:39
16 software that you just described earlier?
17    A.  I assume so.
18    Q.  If you go on to the next part of the     14:10:54
19 sentence, there's a reference to "a necessity to
20 increase bandwidth."
21    Do you see that?             14:11:01
22    A.  Um-hum.
23    Q.  Is that a reference to the increase in
24 bandwidth that you talked about earlier in your    14:11:07
25 testimony?
                Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

GROSSMAN & COTTER      (650) 324-1181              06AUG2806

b5cc5e24-d3ac-4436-aaa4-f02314997231

PHILLIPS   VS.   NETBLUE   RITCHIE PHILLIPS                AUGUST 28, 2006

---

Page 110

1    A.  Yes.
2    Q.  And then the next phrase refers to "a
3  necessity to increase server capacity."            14:11:15
4       Do you see that?
5    A.  Yes.
6    Q.  Was that the increase in server capacity    14:11:19
7  that you just testified about in this deposition?
8    A.  Yes.
9    Q.  The next reference says to "increased        14:11:30
10  service charges."
11       Do you see that?
12    A.  Yes.                                        14:11:31
13    Q.  Do you know what that is a reference to?
14    A.  Well, all of our service is -- are based on
15  making a profit.  When there's expenses that go out,  14:11:55
16  we have to raise prices to cover it.  It's not real
17  complicated.
18    Q.  Okay.  Just to be fair, look at the opening  14:12:05
19  part of that sentence that says, "Plaintiff has
20  incurred monetary losses in the form of," and then
21  skip a few phrases and you get to "increased service  14:12:14
22  charges."  That appears to me to be an expense that
23  you've incurred for service charges.
24       Have you incurred additional expenses?       14:12:23
25    A.  No.  Let me -- let me -- increased

---

Page 111

1  bandwidth and necessity to increase server capacity,
2  increased service charges.
3       I'm not sure what that's relating to,         14:12:57
4  actually.
5    Q.  Okay.  As you sit here today, can you not
6  think of any service charges that might have          14:13:04
7  increased?
8    A.  That my service charges increased or I --
9    Q.  Service charges --                           14:13:11
10    A.  -- or I increased my service charges?
11    Q.  No.  The service charges to you increased.
12    A.  No.  Just the cost of the spam filter and    14:13:17
13  the bandwidth and monitoring the software and
14  monitoring the filters and adjusting them and --
15    Q.  Now, when you talk about "monitoring," you   14:13:29
16  mean personal monitoring by you?
17    A.  Yes.
18    Q.  That's all I have on that document.  Thank   14:13:36
19  you.
20       Now, would you please look at a document
21  which I will have marked as Exhibit 9.  It's also a   14:14:27
22  set of Plaintiff's Responses to Defendants'
23  Interrogatories.
24       (Whereupon, Defendants' Exhibit 9 was        14:14:29
25  marked for identification.)

---

Page 112

1  BY MR. CLARK:
2    Q.  First of all, would you please look at the
3  second to the last page of that document and tell me  14:14:53
4  if that's your signature.
5    A.  Yeah, that's me.
6    Q.  And now would you please go back to Page 6   14:15:00
7  of the document.  And as part of the response to
8  Interrogatory Number 6, if you would start at Line 14
9  and just read through to Page 18 [sic] to yourself   14:15:13
10  and then tell me when you're ready.
11       You've turned the page.  My focus is on
12  just on those four lines.  But if you want to read    14:16:46
13  on, you're free to do it.
14    A.  Oh.  I thought you were asking me to read
15  to the end of the page.                              14:16:50
16    Q.  No.  Just to --
17    A.  You said from Lines 14 to 18?  Is that what
18  you're talking about?                                14:16:54
19    Q.  Yes.  First of all, on Line 16 there's a
20  reference to Internet protocol address.
21       Do you see that?                              14:17:00
22    A.  Yes.
23    Q.  Is that the numerical address that's
24  assigned to a sender's server or computer?           14:17:09
25    A.  Well, an IP address is a numerical address

---

Page 113

1  assigned to any computer that has direct access to
2  the Internet, mail server, Web server, workstation.
3  Doesn't matter.                                      14:17:20
4    Q.  Okay.  Now, the allegation in this -- in
5  Lines 14 through 18 is that the e-mails violate the
6  stated section because -- there are two alternatives,  14:17:32
7  and the second alternative is that the Internet
8  protocol address, the access to which for purposes of
9  initiating the message was obtained by means of false  14:17:45
10  or fraudulent pretenses or representations."
11       Do you see that?
12    A.  Yes.                                          14:17:49
13    Q.  Now, do you have any information that
14  suggests that NetBlue initiated a message that was
15  obtained by means of false or fraudulent purpose or   14:18:02
16  pretenses?
17    A.  I don't have any information besides that
18  which in these documents that have been submitted.    14:18:07
19    Q.  Okay.  And what is it that you're referring
20  to in the documents that you believe supports this?
21    A.  Well, I believe there was an explanation     14:18:12
22  and examples given on -- I don't know -- several of
23  the e-mails and the problems of ProtectFly and trying
24  to find out who owns those domains, who owns those IP  14:18:26
25  addresses.  I think that's what this is talking about

---

b5cc5e24-d3ac-4436-aaa4-f02314997231

PHILLIPS   VS.   NETBLUE   RITCHIE PHILLIPS                AUGUST 28, 2006

Page 114

1  here.
2      Q.  Okay.  But as you sit here today, you don't
3  have any additional information to add?        14:18:34
4      A.  No.  No.  As far as I know, we've given you
5  all the information we have.
6          MR. CLARK:  Okay.  Let me next have marked  14:19:07
7  as Exhibit 10 a copy of a Complaint in the action of
8  Ritchie Phillips versus SocialNet.
9          (Whereupon, Defendants' Exhibit 10 was    14:19:14
10  marked for identification.)
11         MR. CLARK:  While you're looking at that,
12  let me also mark a further exhibit, which is Exhibit  14:19:46
13  11, which is a Complaint in Ritchie Phillips versus
14  Worldwide Internet Solutions.
15         (Whereupon, Defendants' Exhibit 11 was    14:19:52
16  marked for identification.)
17  BY MR. CLARK:
18     Q.  Mr. Phillips, would you please look at     14:20:19
19  Exhibits 10 and 11 and tell me if those are copies of
20  the Complaints and Actions that you've filed under
21  the Can-Spam Act?                              14:20:25
22     A.  Yes.  They appear to be.
23     Q.  Now, starting off first with Exhibit 10,
24  the SocialNet case, does that case also relate to   14:20:38
25  e-mails that were sent to your server?

Page 115

1      A.  I don't understand the question.
2      Q.  Do you know whether or not the SocialNet
3  claim arises out of e-mails that were sent to your  14:20:57
4  server?
5      A.  As far as I know.
6      Q.  Now, did any of the recipients of those   14:21:07
7  e-mails request you to file this lawsuit on their
8  behalf?
9          MR. SINGLETON:  Excuse me.  I'm going to  14:21:14
10  pose an objection.
11         What is the relevance to the subject matter
12  of this action whether he received e-mails and filed  14:21:21
13  another Complaint in another case or whether his
14  actual end user clients received the e-mails and
15  complained?  If you can show me some relevance to   14:21:30
16  this case, I suppose I'll allow my client to answer
17  the question.
18         MR. CLARK:  Yes.  The relevance is that   14:21:35
19  there's a question in this case with regard to
20  whether this plaintiff is suing because he actually
21  was adversely affected by any of the e-mails or     14:21:46
22  whether he's in fact suing as the agent of some other
23  unknown person.  And if he's been personally damaged
24  and personal suffered adverse effect, that's one    14:22:02
25  thing.  But if he hasn't and his customers haven't,

Page 116

1  then --
2          MR. SINGLETON:  I think he's already
3  testified as to all the adverse effect that spam     14:22:11
4  causes his business, but that still doesn't tell me
5  how this has any relevance to whether he suffered
6  adverse effect as a result of what NetBlue did.      14:22:19
7  What's the relevance to that?  There's no nexus
8  between this and what you just told me.
9          MR. CLARK:  Well, there's a pattern of     14:22:24
10  conduct by the plaintiff, and this is part of the
11  pattern of conduct.
12         MR. SINGLETON:  How is that relevant to any  14:22:31
13  claim or defense?
14         MR. CLARK:  It's relevant to whether or not
15  he is a real plaintiff or whether he's a puppet      14:22:37
16  plaintiff representing somebody else.
17         MR. GRABOWSKI:  Are you trying to make some
18  kind of like -- what do you call it -- a lawsuit     14:22:48
19  issue of standing?
20         MR. CLARK:  Yes.  It goes to standing.
21         MR. SINGLETON:  Okay.  All right.  Well, is  14:22:55
22  that an affirmative defense pled in the Answer, that
23  he's a professional plaintiff and lacks standing?
24         MR. CLARK:  I don't know.              14:23:01
25         MR. SINGLETON:  Is lacks standing even pled

Page 117

1  in the Answer?  Because if it's not in the Answer,
2  then it's not an issue in this case.
3          MR. CLARK:  Standing is always an issue,    14:23:09
4  Counsel.  It's not a -- you don't have to plead it
5  affirmatively.
6          MR. GRABOWSKI:  Well, more importantly, all  14:23:13
7  the case law -- we want to go off the record for a
8  second and discuss this.
9          MR. CLARK:  No.  I think we should stay on  14:23:18
10  the record.  I don't want to prolong the discussion,
11  but I either want the witness to answer the question
12  or not answer the question.  If he doesn't answer the  14:23:23
13  question, I'll add it to my list of subjects with the
14  judge.
15         MR. SINGLETON:  I just want to make sure I  14:23:32
16  understand.  You want to know about the details of
17  e-mails he received as spam and filed an unrelated
18  lawsuit on because it tends in logic and reason to   14:23:43
19  prove that he is, A, a professional plaintiff, and B,
20  that he never actually suffered adverse effect; is
21  that accurate?                                14:23:52
22         MR. CLARK:  No, it's not accurate.
23         I don't know whether he's a professional
24  plaintiff or not.  I have no idea.  That's why I'm   14:23:58
25  asking the questions.  I want to know because it goes

GROSSMAN & COTTER       (650) 324-1181                06AUG2806

b5cc5e24-d3ac-4436-aaa4-f02314997231

PHILLIPS   VS.   NETBLUE   RITCHIE PHILLIPS                AUGUST 28, 2006

Page 118

1  to the question of adverse effect.  In order to have
2  standing, he has to have -- he has to prove adverse
3  effect.                               14:24:12
4         MR. SINGLETON:  Minimally, yes.  Which I
5  believe we already went through.  Go ahead.
6         MR. CLARK:  And one of the factors which  14:24:17
7  indicates whether or not he's been adversely affected
8  is whether he spontaneously of his own volition filed
9  these lawsuits or whether he's filing these lawsuits  14:24:24
10  as a front for somebody else.  And one of those --
11  and I believe it's relevant to that inquiry whether
12  he was asked by any of his customers to file a  14:24:36
13  lawsuit.
14         MR. SINGLETON:  It's a little --
15         THE WITNESS:  Wait a minute --      14:24:39
16         MR. SINGLETON:  -- tangentially related, a
17  little tangentially related.  However, I suppose in
18  the far reaches and realms of possibility, one might  14:24:48
19  remotely prove the other.  So consequently, I'll
20  allow you to ask the question and I'll ask my client
21  to answer, to a limited extent.         14:24:56
22         MR. CLARK:  I appreciate it.  Thank you.
23         THE WITNESS:  Let me see if I understand
24  the question.                          14:25:00
25  BY MR. CLARK:

Page 119

1     Q.  Let me put it again.
2     A.  Okay.
3     Q.  Let me back up and lay a foundation first.  14:25:08
4         You understand, do you, Mr. Phillips, that
5  the SocialNet action is based on certain e-mails that
6  were sent to your server.               14:25:18
7         Do you understand that?
8     A.  Yes.
9     Q.  Did any of the recipients of those e-mails  14:25:21
10  that formed the basis of the SocialNet action request
11  that you file that action?
12     A.  No.                            14:25:27
13     Q.  With respect to the Worldwide Internet
14  Solutions case, which is --
15         MR. SINGLETON:  They're both the same case.  14:25:35
16  One's a First Amended Complaint to the second.
17         THE WITNESS:  Are you asking me if there's
18  -- if this -- if I'm suing at the behest of my  14:25:43
19  customers?  No.  Is that what you're asking me?
20  BY MR. CLARK:
21     Q.  That's what I'm asking you.       14:25:47
22     A.  No.  This -- only as a secondary cause.
23  This -- the reason there are laws against spam is
24  because it's miserable for everybody.   14:26:00
25         Nobody has any question whether spam itself

Page 120

1  has a terrible adverse effect on bandwidth, on
2  servers, on employees, on customers, on everybody.
3  We suffer that adverse effect daily because of this  14:26:15
4  junk.  And so that, in and of itself, is enough for
5  me to go to lawyers and go:  Is there anything we can
6  do to stop these people from doing what they're  14:26:23
7  doing?
8         So does that answer your question?
9     Q.  Actually, there wasn't a question, so I'm  14:26:28
10  going to move to strike as nonresponsive the entire
11  -- your entire statement.
12         MR. SINGLETON:  There is no judge here,  14:26:33
13  Counsel.  You can't strike it.  It's on the record.
14  The court reporter will record it.
15         THE WITNESS:  I thought I answered the  14:26:38
16  question.
17  BY MR. CLARK:
18     Q.  There are --                    14:26:40
19         MR. SINGLETON:  Just for your edification,
20  there are not two Complaints.  There are only --
21  there's only one Complaint that you've referred to.  14:26:46
22  One's the First Amended Complaint following the
23  second.  They have the same case number, if you look
24  carefully.                            14:26:51
25         MR. CLARK:  I see that.

Page 121

1         MR. SINGLETON:  Okay.  Great.
2  BY MR. CLARK:
3     Q.  Mr. Phillips, have you been ordered to pay  14:26:59
4  costs in any case in which you've filed a lawsuit?
5         MR. SINGLETON:  It's not relevant to the
6  subject matter of the action.  But for your own  14:27:09
7  edification, I'll allow him to answer.
8         MR. CLARK:  Okay.  Thank you.
9         THE WITNESS:  No.                 14:27:12
10  BY MR. CLARK:
11     Q.  Do you have an agreement with anybody that
12  you will be indemnified with respect to any adverse  14:27:18
13  orders to costs which may be awarded against you in
14  any action that you've filed?
15         MR. SINGLETON:  Objection.  It's not  14:27:23
16  relevant to the subject matter of this action.
17         And I will instruct you not to answer the
18  question.                             14:27:30
19  BY MR. CLARK:
20     Q.  Okay.  Let me ask you with respect to this
21  action.                               14:27:32
22         Do you have an agreement that, with respect
23  to this action against NetBlue, that you will be
24  indemnified for any award of costs that may be made  14:27:40
25  against you?

b5cc5e24-d3ac-4436-aaa4-f02314997231

PHILLIPS   VS.   NETBLUE   RITCHIE PHILLIPS               AUGUST 28, 2006

Page 122

1    MR. SINGLETON:  Again, same objection.
2  It's not relevant to any cause of action or
3  affirmative defense pled in either the Answer or the   14:27:48
4  Complaint, and therefore, it's not subject to
5  discovery.
6    MR. CLARK:  It's relevant to the standing   14:27:52
7  issue for exactly the same reasons as it's relevant
8  whether or not he was asked by the e-mail recipients
9  to file the lawsuit.                           14:27:59
10    MR. CLARK:  Fair enough.
11  I'll allow you to answer the question.
12    THE WITNESS:  I don't even understand the   14:28:04
13  question.  I don't know what you're asking me.
14  BY MR. CLARK:
15    Q.  Okay.  Let me -- do you understand what the   14:28:07
16  word "indemnify" means?
17    A.  Actually, that's where you lost me.
18    Q.  Okay.  The word "indemnify" means that   14:28:13
19  somebody will reimburse you if you're required to
20  pay --
21    A.  (Cell phone rings.)  Excuse me.  I'll tell   14:28:19
22  them to go away.  There.  Let me turn this off.
23    MR. SINGLETON:  Why don't you, if you can
24  put it in layman's terms, Counsel, it would be   14:28:28
25  easier, I think.

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 123

1    MR. CLARK:  I'll try.
2    THE WITNESS:  Well, let's see.  Did I
3  forget how to turn this stupid thing off?       14:28:43
4  BY MR. CLARK:
5    Q.  Let me try and give you a definition of
6  "indemnify."  "Indemnify" means that somebody will   14:28:51
7  reimburse you if you're required to pay any amount of
8  money.
9    A.  No.                                      14:28:59
10    Q.  Okay.  So now, with that understanding of
11  the word "indemnify," do you have an agreement with
12  anybody to pay any costs that you might be ordered to   14:29:11
13  pay in this case?
14    A.  No.  Okay.  I still didn't understand the
15  question.  I thought you asked me has anybody   14:29:18
16  promised to pay any losses that I had for me in case
17  I have any losses?  Is that what you're asking?
18    Q.  No.  Let me give you a little more of an   14:29:28
19  explanation.
20    In litigation, the court can, under certain
21  circumstances, order one party or the other to pay   14:29:41
22  expenses to the other party.
23    A.  Um-hum.
24    Q.  For example, if the judge figured we did   14:29:46
25  something bad, the judge might order us to pay $1,000

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 124

1  for a discovery motion.  If the judge thinks you did
2  something bad, you might be ordered to pay me or my
3  client $1,000 for some discovery motion.  So there's   14:29:59
4  costs that might be paid.
5    My question is:  Do you have an agreement
6  with anybody that, if you're ordered to pay costs of   14:30:07
7  that kind, some other person will pay them on your
8  behalf?
9    A.  No.                                      14:30:11
10    MR. CLARK:  Except for the subjects that
11  we're waiting for the judge to rule on, and with the
12  caveat I need to go through my notes one more time,   14:30:29
13  I'm done.  So can we take a short break?  I'll look
14  through my notes.
15    MR. SINGLETON:  Certainly.              14:30:37
16    MR. CLARK:  I'll come back in a few
17  minutes.
18    THE VIDEOGRAPHER:  We are off the record.   14:30:41
19  The time is 2:30.
20    (Recess taken.)
21    THE VIDEOGRAPHER:  We are back on the     14:45:26
22  record.  The time is 2:45.
23  BY MR. CLARK:
24    Q.  Thank you.  Mr. Phillips, just a couple of   14:45:31
25  things about the physical set-up of your premises.

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

Page 125

1    Do you have a retail store --
2    A.  Yes.
3    Q.  -- with sort of a shop front in there?   14:45:42
4    A.  Yes.
5    Q.  And you have computers on display for sale?
6    A.  Yes.                                  14:45:45
7    Q.  And then you have a server section?
8    A.  Yes.
9    Q.  So it's a regular sort of Main Street   14:45:53
10  business?
11    A.  It's a retail store.  It's right on 101.
12    MR. CLARK:  Okay.  That's all I have.    14:45:58
13  Thank you very much.
14    THE VIDEOGRAPHER:  This marks the end of
15  Volume I, Videotape 2 in the deposition of Ritchie   14:46:04
16  Phillips.  The number of tapes used today is two.
17  The original videotapes will be retained by Dan
18  Mottaz Video Productions.  The time is 2:46 p.m.  We   14:46:15
19  are off the record.
20    (Whereupon, the August 28, 2006 deposition
21  of RITCHIE PHILLIPS ended at 2:46 p.m.)       14:46:20
22
23
24                        14:46:20
                    RITCHIE PHILLIPS
25

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

GROSSMAN & COTTER        (650) 324-1181                 06AUG2806

b5cc5e24-d3ac-4436-aaa4-f02314997231

PHILLIPS   VS.   NETBLUE   RITCHIE PHILLIPS                    AUGUST 28, 2006

Page 126

1        I, JoAnne Ichiki, duly authorized to
2  administer oaths pursuant to Section 2093(b) of the
3  California Code of Civil Procedure, do hereby        14:46:20
4  certify:  That the witness in the foregoing
5  deposition was administered an oath to testify to the
6  whole truth in the within-entitled cause; that said    14:46:20
7  deposition was taken at the time and place therein
8  cited; that testimony of said witness was reported by
9  me and thereafter transcribed under my direction into  14:46:20
10  typewriting; that the foregoing is a complete and
11  accurate record of said testimony; and that the
12  witness was given an opportunity to read and correct   14:46:20
13  said deposition and to subscribe the same.  Should
14  the signature of the witness not be affixed to the
15  deposition, the witness shall not have availed         14:46:20
16  himself/herself of the opportunity to sign or the
17  signature has been waived.  I further certify that I
18  am not of counsel nor attorney for any of the parties  14:46:20
19  in the foregoing deposition and caption named nor in
20  any way interested in the outcome of the cause named
21  in said caption.                    14:46:20
22  DATED:  September 5, 2006
23
24          JOANNE ICHIKI        14:46:20
            CERTIFIED SHORTHAND REPORTER
25          NO. 11660
        Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

GROSSMAN & COTTER        (650) 324-1181              06AUG2806

b5cc5e24-d3ac-4436-aaa4-f02314997231